IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| MARIE MAYEROVA, and ARIANA CHRETIEN, Individually and on behalf of all those similarly situated<br><br>Plaintiffs,<br>v.<br><br>EASTERN MICHIGAN UNIVERSITY, JAMES SMITH, SCOTT WETHERBEE, and THE BOARD OF REGENTS,<br><br>Defendants. | CIVIL ACTION NO.<br><br>COMPLAINT AND JURY DEMAND<br><br>June 15, 2018 |
|---|---|

## INTRODUCTION

This is an action based on long-standing and ongoing violations of Title IX of the Education Amendments of 1972 by Eastern Michigan University ("EMU"), and by its Director of Athletics, President, and Board of Regents. In March 2018, Defendant Eastern Michigan University eliminated its women's tennis and softball teams in the middle of the term and their competitive seasons. Although entirely consistent with the manner in which Defendant EMU has discriminated against female athletes in the past, the decision to disband the teams nevertheless came as a surprise to the student-athletes and their coaches.

The decision to end women's tennis and softball teams at EMU has left the players—many of whom were foreign students—in limbo. For the foreign

players, the option was to withdraw from Defendant EMU, give-up their visas, and return to their countries of origin, only to restart the process of applying to universities with the hope of gaining admission, obtaining scholarships, winning a spot on another team, and securing a new visa, all before the next season begins. The female student athletes could stay at EMU and keep their scholarships. However, these females are athletes, who trained from an early age to play tennis and softball, who were recruited by EMU to play tennis and softball, and who came to Defendant's campus to play tennis and softball. The choice to stay and forego their dream is not a real choice or a viable option for these Plaintiffs, nor is it a fair choice to ask of these student athletes who have given so much of their time, effort, blood, sweat and tears to their sports and the university that betrayed their trust.

Because Defendant EMU persists in its misconduct, this action is brought by the female tennis and softball players in their individual capacities as well as on behalf of all similarly situated student athletes now and in the future, to redress the undisputed historic and ongoing discriminatory conduct perpetrated by Defendant EMU.

**STATEMENT OF THE CASE**

1. Defendant EMU discriminates against women on the basis of sex by, among other things, providing substantially fewer and poorer opportunities for women in sports than for male students.

2. Defendant EMU compounded its historic Title IX wrongs in March 2018, by terminating the eight-member women's varsity tennis team and seventeen-member women's softball team and with it, all opportunities for women to play intercollegiate tennis and softball at EMU.

3. Defendant EMU intentionally concealed its decision to terminate the women's tennis and softball programs in order to deprive Plaintiffs of any effective opportunity to contest the decision. This secret decision also denied Plaintiffs any opportunity to plan for, protect themselves against, or mitigate the sudden and devastating impacts on their personal and academic lives and sports careers.

4. Throughout the months of March and April 2018 the EMU, its President James Smith, its Athletic Director Scott Wetherbee, and its Board of Regents have been contacted, petitioned, met with by multiple people, groups, and organizations to request reconsideration of its unlawful termination of women's tennis and softball. The Administration of EMU, including its President, Athletic Director, and Board of Regents have all steadfastly insisted that their decision to eliminate the teams was "final and irreversible."

5. Plaintiffs seek to stop Defendants from discriminating against them and all others similarly situated now and in the future. They seek injunctive relief to prevent Defendants from eliminating the women's tennis and softball programs and to require Defendants to add women's varsity athletic opportunities until Defendants offer equal opportunity to participate in varsity athletics free from discrimination.

**JURISDICTION AND VENUE**

6. This action arises under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*, and the regulations and policies promulgated pursuant to that law, as well as under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as enforced through 42 U.S.C. § 1983.

7. This Court has jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. §§ 1331, 1343(3), and 1343(4).

8. Declaratory and other relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202 to obtain the correct interpretation of the legal requirements described in this Complaint, which are necessary and appropriate to determine the respective rights and duties of the parties to this action.

9. Venue is proper in the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b) because the events from

which Plaintiffs' claims arise occurred in Ypsilanti, Michigan, which is within the jurisdiction of this Court.

**THE PARTIES**

10. Every spot on the women's tennis and softball teams represents a lifetime of dreams and the sacrifice that it took to make those dreams a reality, including overcoming life-changing personal, family, economic, and physical challenges both on and off the field or court. It should be noted that the women Plaintiffs here are not in this alone. While not parties to this lawsuit, their families have done their best to encourage their daughters' dreams and support them through their struggles, and suffer as only parents can, when those dreams are shattered, as well as the coaching staffs who work with and support the student athletes on a daily basis.

11. The women's tennis team at Defendant EMU consisted of a dedicated Head Coach Jayson Wiseman, second year graduate assistant Daniela Vidal, and a group of student athletes who had developed themselves into community and academic leaders.

12. The softball team at Defendant EMU consisted of long dedicated Head Coach Melissa Gentile, Full time Assistant Coach Kim Burke, first year graduate assistant Magali Frezzotti, first year volunteer assistant Sara Driesenga, and a group

of student athletes who have developed themselves into community and academic leaders.

***Plaintiff Marie Mayerova***

13. Plaintiff Marie Mayerova is a rising senior at Defendant EMU. She joined the women's tennis team her freshman year in 2015 and played until Defendant EMU wrongfully terminated the team. Marie played tennis in her native Czech Republic beginning as a child. During secondary school, she began studying English to pursue her goal of coming to the United States—the only country where a young woman like her could play competitive tennis while obtaining a world-class education. Eventually, Marie became one of the top players in her country. She would eventually score high enough marks on her standardized test and English aptitude test to gain admission to Defendant EMU as a recruited member or the women's tennis team and receive a full scholarship offer. Marie navigated the difficult process of obtaining a scarce student visa. Her visa restricts her to attending only one school—Defendant EMU. She was recruited by EMU, and chose it because of the competitive opportunities, great coaching, and the full scholarship it offered. Since her arrival at Defendant EMU she has won many matches over her three years competing for the EMU Eagles, with the majority of those wins coming while playing at one of the top singles and doubles positions on the team. Plaintiff

Marie Mayerova's stellar play helped lead the team to its 16-10 record in 2018 and for that she received several weekly conference honors.

14. After Defendant EMU disbanded the team, Plaintiff Mayerova received interest from other schools but does not have the resources to effectively transfer. To do so, she would have had to apply for and obtain admission to another institution with room for her on its women's tennis program, obtain a scholarship offer, withdraw from Defendant EMU, return to Czech Republic, forfeit her student visa, and re-apply for a new visa to attend a specific new school. Even if she could get a new visa, there could be no assurance that the tennis team at the new college would still have scholarships or even room for her by the time she could arrive on campus. Moreover, under the rules of the National Collegiate Athletic Association ("NCAA"), a student athlete in an NCAA Division I program such as Defendant EMU is only allowed a single transfer to a Division I school. These risks, which are generally applicable to all of the female student athlete Plaintiffs, are hereafter referred to as the "Transfer Risks." In addition, the Transfer Risks pose too great an obstacle for Marie who would suffer further harm through the loss of course credits and the requirement that she complete an additional semester or two at her own cost and expense at a new university. Because she would lose her senior year of eligibility, Plaintiff Marie Mayerova would also be denied the possibility of

additional employment, potentially with a full scholarship, as a graduate tennis assistant coach at Defendant EMU or elsewhere. Plaintiff Mayerova resides in Ypsilanti, Michigan which is within this Court's jurisdiction.

***Plaintiff Ariana Chretien***

15. Ariana Chretien is a Commerce, Michigan native and just completed her sophomore year at EMU. She joined the women's softball team her freshman year in 2016 and played until Defendant EMU wrongfully terminated the team. Ariana has played softball almost her entire life. She plays short stop and second base. Softball has been one of her biggest motivators. Ariana loves the game, loves the commitment and loves the team atmosphere surrounding the softball team. Arian is studying aviation, which is not a common major and many schools do not have aviation programs. She was recruited by EMU, and chose it because of the competitive opportunities, great coaching, scholarship opportunities and the fact that she is pursuing a less common major. Since her arrival at Defendant EMU she has been successful in her two years competing for the EMU Eagles. She played and started 72 games for the Eagles between second base and shortstop. She posted career-highs in batting average, hits and fielding percentages. She has maintained a 3.92 grade point average.

16. After Defendant EMU disbanded the team, Plaintiff Chretien received interest from other schools but has been limited in her selection because the aviation major is not offered at many schools. Even if there is an aviation major, the chance of the institution having scholarships available is limited because scholarship money has already been promised to students the following year. Plaintiff Chretien resides in Ypsilanti, Michigan which is within this Court's jurisdiction.

***Defendant EMU***

17. Defendant EMU is a principal campus of the Eastern Michigan University, which is an Educational Corporation formed under existing state law in the state of Michigan. EMU's campus and principal place of business is located at 900 Oakwood Street, Ypsilanti, Michigan, which is within this Court's jurisdiction.

18. Defendant EMU holds itself out as a university committed to providing top-quality intercollegiate sports programs. The university uses this distinction as part of its efforts to recruit top student athletes and coaching staff. Under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and the regulations adopted pursuant to 34 C.F.R. Part 106 (collectively "Title IX"), Defendant EMU must provide equality of opportunity for women and men in every program it offers, including equal opportunities for male and female athletes in intercollegiate sports programs.

***Defendant Scott Wetherbee***

19. Defendant Scott Wetherbee is and has been the Director of Athletics of EMU, since 2017. Defendant Wetherbee is an employee and agent of Defendant EMU who reported directly to and was under the direct supervision and control of Defendant James Smith at all times relevant to this Complaint.

***Defendant James Smith***

20. Defendant James Smith is and has been the President of Defendant EMU since 2016. Defendant Smith is the highest-ranking employee of Defendant EMU and provided final administrative approval of all decision by Defendant Wetherbee. Defendant Smith was also prepared to hide the cuts being made until the end of the 2018 academic year in an attempt to keep the information from the students, athletes, and coaches in order to keep from receiving negative press attention and to forestall legal and public relations push back for the decisions.

***Defendant Board of Regents***

***James Webb***

21. James Webb who at all relevant times was a member of the governing Board of Regents of Defendant EMU. Further Mr. Webb is the Chair of the Board of Regents who provided the authorization and final approval of the illegal reduction of the women's tennis and softball programs.

***Michael Hawks***

22. Michael Hawks is a member of the Board of Regents and a member of the Athletic Affairs Committee. The athletic affairs committee willfully ignored all the information, statistics, petitions, and presentations of the community, students, and alumni, which were supportive of maintaining women's tennis and softball. As a Board of Regent Member, Hawks provided authorization and final approval of the illegal reduction of the women's tennis and softball programs.

***Alex Simpson***

23. Alex Simpson is a member of the Board of Regents and a member of the Athletic Affairs Committee. The athletic affairs committee willfully ignored all the information, statistics, petitions, and presentations of the community, students, and alumni, which were supportive of maintaining women's tennis and softball. As a Board of Regent Member, Simpson provided authorization and final approval of the illegal reduction of the women's tennis and softball programs.

***Crumm, Treder, Beagen, Jeffries and Morris***

24. Michelle Crumm, Mary Treder Lang, Dennis M. Beagen, Eunice Jeffries, and Mike Morris are all members of the Board of Regents at Defendant EMU who provided the authorization and final approval of the illegal reduction of the women's tennis and softball programs.

**ALLEGATIONS AS TO THE PLAINTIFFS CLASS**

25. The named female Plaintiffs (Mayerova and Chretien) bring this action on behalf of themselves and on behalf of a class of all those similarly situated both now and in the future pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2).

26. The female Plaintiffs seek to represent a class of all present, prospective, and future female students at EMU who want to participate in the recently eliminated varsity sports of women's tennis and softball or who want to participate in other varsity sports not offered to women by EMU. They also seek to represent those female student athletes who are deterred from enrolling at EMU because it does not offer women the sport they wish to play.

27. Each of the named women Plaintiffs is a member of the proposed class and has been or will be injured by Defendant EMU's sex discrimination and failure to provide female students with an opportunity to participate in varsity intercollegiate athletics at EMU. Defendant EMU's announced elimination of the women's varsity tennis and softball programs will exacerbate the discrimination and denial of opportunity by eliminating female athletic participation opportunities at EMU.

28. The female Plaintiffs seek to represent the proposed class because joinder of all class members and all persons harmed by Defendant EMU's failure to

provide equal opportunity to participate in varsity intercollegiate athletics is not just impracticable, but impossible.

29. The proposed class is known to exist, but the identity of its members is and will continue to change without specific names during this litigation because of the nature of college enrollment and athletic participation. Students at EMU generally aim to graduate four years after they matriculate. Athletes are eligible for only four years, according to the rules of the National Collegiate Athletic Association (NCAA). Accordingly, the members of the class harmed by Defendant EMU's discriminatory actions constantly change as each class of students graduate and as another class of students enrolls at EMU.

30. Not all members of the plaintiff class are currently identifiable because the class includes prospective and future students who will enroll at EMU during this litigation or who will be deterred from enrolling at EMU because of Defendants' failure to provide athletic participation opportunities for female student-athletes, including the sports in which they want to participate.

31. Not all members of the plaintiff class are currently identifiable because the class includes not only tennis and softball players, but also all present, prospective, and future female students who want to participate in other varsity intercollegiate sports that are not offered at Defendant EMU.

32. Upon information and belief, Defendant EMU has never surveyed its present or prospective student body to assess athletic interests and abilities. Moreover, because EMU recruits high school students and transfer students from around the world, EMU could increase and thus realize athletic participation opportunities for female students by starting virtually any new women's varsity sports team and then recruiting women to enroll and participate.

33. It is unknown how many present, prospective, or future female student athletes would enroll at Defendant EMU or would participate in athletics at the university if it stopped discriminating against women. The hundreds of additional student-athletes who might apply, who might be recruited, and who might participate in athletics at Defendant EMU if, for example, it added the approximately two hundred athletic opportunities necessary to reach proportional equality of opportunity for women participating in intercollegiate sports at Defendant EMU before the sports cuts were made, and one hundred and twenty opportunities, after the reduction of men's swimming & diving and wrestling, are too numerous to make joinder practicable.

34. The female Plaintiffs satisfy the "commonality" requirement of Federal Rule of Civil Procedure 23(a)(2) because they share questions of law and fact in common with the proposed class, particularly whether Defendant EMU is violating

Title IX by failing to provide female student athletes with an opportunity to participate in varsity intercollegiate athletics. Because Title IX requires comparison of the sex-segregated men's and women's athletic opportunities as a whole, the Title IX issues in this action are inherently class-based.

35. The female Plaintiffs satisfy the "typicality" requirement of Federal Rule of Civil Procedure 23(a)(3) because their claims are typical of those of the proposed class. They all have been denied, are continuing to be denied, or will be denied an opportunity to participate in varsity intercollegiate athletics at Defendant EMU because of its ongoing sex discrimination. All of them want the Court to restrain Defendant EMU from continuing its elimination of any women's varsity sports opportunities and to require it to restore and reinstate tennis and softball and add more women's varsity sports.

36. The female Plaintiffs are members of the proposed class and will fairly and adequately represent the interests of the class pursuant to Federal Rules of Civil Procedure 23(a)(4). They intend to prosecute this action vigorously in order to secure fair and adequate injunctive relief for the entire class.

37. The female Plaintiffs satisfy the requirement that class certification would be superior to other methods available for the fair and efficient adjudication of the controversy required by Federal Rule of Civil Procedure 23(b)(2) because

Defendant EMU has acted or refused to act on grounds generally applicable to the class—denying female student athletes an opportunity to participate in varsity intercollegiate athletics, including but not limited to, women's varsity tennis and softball, thereby making final declaratory and injunctive relief appropriate with respect to the class as a whole.

38. Undersigned counsel has devoted substantial and sufficient efforts to identify and investigate potential claims in this action, to developing knowledge of the applicable law, and has sufficient resources to commit to representing this putative class as interim counsel under Federal Rule of Civil Procedure 23(g)(3) until such time as this Court determines whether to certify the action as a class action.

## GENERAL ALLEGATIONS

***The Department of Education Interpretations of Title IX Compliance***

39. Title IX requires in relevant part at 20 U.S.C. § 1681(a):

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

40. Women's tennis and softball at EMU qualify as a program or activity.

41. Defendant EMU receives federal financial assistance as a public institution, even if the programs of women's tennis or softball specifically did not receive public funding.

42. Defendant Board of Regents has control and direction over all expenditures of the University's funds, including federal financial assistance pursuant to M.C.L. § 390.553 and specific persons as detailed above had actual knowledge of the discriminatory acts at issue in this matter.

43. In 1979, the Office of Civil Rights (OCR) issued a policy interpretation of Title IX and the Regulations as applied to intercollegiate athletics at 44 Fed. Reg. at 71418 (the "OCR Policy Interpretation").

44. The OCR Policy Interpretation sets forth three areas of compliance under Title IX: (1) equal athletic financial assistance; (2) equal treatment and benefits for athletic teams; and (3) effective accommodation of student interests and abilities.

45. This lawsuit is about effective accommodation only. The OCR Policy Interpretation provides three ways—commonly referred to as prongs one, two, and three—for a university to comply with the requirement to provide effective accommodation of students' interests and abilities:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

46. Every federal court of appeals that has considered the three-part test has upheld it as valid and has given it deference in assessing Title IX compliance.

47. The Regulations require that sponsors of intercollegiate athletics like Defendant EMU take such remedial actions as are necessary to overcome the effects of sex discrimination in violation of Title IX. *See* 24 C.F.R. § 106.3(a). On information and belief, Defendant has not taken any recent remedial actions to satisfy its obligations under Title IX, nor has Defendant ever provided females with an equal opportunity to participate in varsity athletics.

48. The Regulations also require that sponsors of interscholastic athletics comply with the athletics regulations within three years of their effect date (which was July 21, 1975). On information and belief, Defendant did not comply with the athletics regulations by 1978 and is still not in full compliance with Title IX today—40 years later.

49. The National Association of College and University Attorneys ("NACUA") publishes and updates authoritative legal guidance on, among other matters, the practice of Title IX compliance. Upon knowledge and belief this

guidance is widely available to attorneys with responsibilities as legal counsel in universities, such as Defendant EMU, its President James Smith, its Athletic Director Scott Wetherbee, and its Assistant Vice President and Title IX Coordinator Dr. Melody Werner.

50. The edition of "NACUA Notes" published as of January 22, 2010, is representative of the widely-published guidance that NACUA promulgates to universities across the nation on the important topic of Title IX, stating under the topic "The Title IX Implications of Eliminating an Intercollegiate Sports Team", that

> If an institution chooses to eliminate an intercollegiate team from the underrepresented sex, then it must do so in a manner that ensures substantial proportionality.
>
> …
>
> If an institution eliminates a team and does not replace it with a team that provides greater participation opportunities, then it is legally impossible to comply with part two ("History & Continuing Practice of Program Expansion") of the three-part test. As explained above, part two requires an institution to demonstrate a history and continuing practice of program expansion for the underrepresented sex. Yet, if a college or university is eliminating a team for the underrepresented sex, it is necessarily reducing, not expanding opportunities.
>
> Similarly, if an institution eliminates a team [of the underrepresented sex], it is legally impossible to comply with part three ("Fully Accommodating Interests & Abilities") of the three- part test. As detailed previously, part three of the three-part test requires an institution to

> demonstrate that its current selection of sports fully and effectively accommodates the interests of the underrepresented sex. However, regardless of whether one uses the narrow definition of the Bush Administration or the broader definition of the Obama Administration, an institution that has eliminated a team cannot prove full and effective accommodation. Quite simply, the fact that the institution recently fielded an intercollegiate team demonstrates that there is interest and ability in the sport as well as an expectation of reasonable competition. The institution really has no viable claim otherwise.

NACUA NOTES, June 22, 2010 Vol. 8 No. 10 at 4, 5.

51. This official interpretation shows that Defendant EMU cannot reach compliance with Title IX at this time due to the elimination of two teams of the underrepresented sex.

52. These official findings understate Defendant EMU's repeated and successful efforts to sidestep the requirements of Title IX. For years, Defendant EMU's reports to the Department of Education have employed a variety of methods to short-change female student-athletes, including double-counting both men and women participating in so-called "Indoor Track and Field and Outdoor Track and Field" and counting males who practice with women's teams *as women*.

## **FACTUAL ALLEGATIONS**

53. At the beginning of the 2017/2018 academic and sports calendar, Defendant EMU sponsors men's and women's teams, including baseball, men's and women's basketball, men's and women's cross country, football, mean's and

women's golf, gymnastics, rowing, softball, soccer, men's and women's swimming and diving, tennis, men's and women's track and field, volleyball and wrestling.

54. Defendant EMU is a member of the NCAA and the Mid-American Conference, and participates in Division I, the highest level of intercollegiate competition.

55. Defendant EMU offers athletic scholarships to members of its varsity athletic teams.

56. On information and believe, Defendant EMU has always provided its male students with proportionally more opportunities to participate in varsity intercollegiate athletics than it has offered its female students, thus denying females students an equal opportunity to participate in this education program.

57. The female Plaintiffs were recruited to attend EMU in order to participate on the tennis and softball teams. They expected to participate on their respective teams each of their years at EMU and planned their academic, personal, and financial live accordingly. They would not have enrolled at EMU but for the opportunity to participate in women's tennis and softball, and in many cases, the receipt of an athletic and/or academic scholarship.

58. Defendant recently announced that it will no longer sponsor women's tennis and softball starting the next academic year (2018–2019).

59. The tennis team averaged eight student athletes each year and the softball team averaged approximately seventeen student athletes each year. The elimination of these programs, despite EMU also eliminating men's swimming and diving and wrestling, does not bring them into compliance with Title IX. EMU already discriminates against its female students by offering too few athletic opportunities. By eliminating women's tennis and softball, EMU will make this discrimination worse—despite also eliminating some men's opportunities.

60. Defendant EMU promotes its athletic programs in order to recruit top athletes. Its website lauds the significant dollars that have been invested for the improvement of its athletic facilities: Eastern Michigan University is currently in the construction phase of a $35 million multi-sport complex which is touted to benefit all student athletes at Eastern Michigan University. The complex is being built and the funds expended despite the university not having sufficient enrollment or funds to support women's tennis and softball.[1]

61. Upon information and belief, the annual operating budget for EMU is more than three hundred seven million dollars.[2]

62. Throughout the Fall of 2017 and the first two and a half months of 2018, neither Defendant Wetherbee, nor any of his staff, ever indicated that Defendant

[1] https://today.emich.edu/story/story/10410
[2] https://today.emich.edu/story/story/10410

EMU planned to eliminate women's tennis and softball, despite numerous opportunities to do so.

63. Upon information and belief, Defendant Wetherbee did not conduct appropriate research for an alternative funding, redistribution of funding or assets, or any other options that would not require eliminating sports at Defendant EMU.

64. Upon further information and belief, Defendant Wetherbee did not engage any of his coaches in any effort to find an alternative solution to the budget situation that did not require the elimination of sports at Defendant EMU.

65. Defendant Wetherbee with the knowledge and consent of President Smith and the Board of Regents, and notwithstanding his knowledge of Defendant EMU's non-compliance and his responsibilities to the student athletes as Athletics Director of Defendant EMU, expressly supported the unlawful decision to terminate the women's tennis and softball teams.

66. After EMUs announcement that it was cutting women's tennis and softball, students, parents, coaches, alumni and professional organizations complained to the Defendants multiple times that they were out of compliance with Title IX and demanded that the female programs not be cut.

67. Defendant EMU ignored all private and public requests to maintain the programs.

68. On June 6, 2018, Plaintiff's counsel sent Defendants a letter complaining about the elimination of the women's varsity tennis and softball programs, explaining why the elimination of the program constitutes sex discrimination under Title IX, and requesting a dialog about the continuation of the two programs. Defendants failed to respond by the requested date of June 18, 2018.

**INJUNCTIVE RELIEF**

69. Plaintiffs are entitled to injunctive relief that restrains Defendant from continuing to discriminate on the basis of sex, restrains Defendant from eliminating the women's varsity tennis and softball programs, and requires Defendants to provide its female students to participate in varsity intercollegiate athletics by sponsoring additional women's' varsity athletic opportunities based upon the interests and abilities of Defendants' present, prospective, and future students.

70. Failure to grant the requested injunctive relief will cause irreparable harm to the Plaintiffs by continuing Defendants' discrimination against them and EMU's present, prospective, and future female students, and by forever denying them an equal opportunity to participate in varsity intercollegiate athletics. If Defendants are not restrained from eliminating women's varsity tennis and softball, Plaintiffs will never again have the opportunity to participate in this valuable educational experience—one that provides academic, physical, psychological,

social, and even economic benefits for the rest of the participants' lives. There is no adequate remedy at law for this harm.

71. The continuing, irreparable harm caused by Defendants' discriminatory actions far outweighs any possible harm that granting the injunctive relief might cause Defendants. Preliminarily enjoining Defendants' elimination of the varsity women's tennis and softball programs in particular merely ensures retention of the status quo during the course of this litigation, because these athletes have limited (if any) opportunities to pursue their interests and abilities elsewhere—especially at this late date. Defendant will suffer no harm by reinstating the women's varsity tennis and softball programs, other than the monetary cost of the program that it has already borne for many years.

72. The lifelong harm caused to Plaintiffs by Defendants' discrimination is irreparable and can never be adequately compensated with money. This harm far outweighs any monetary cost incurred by Defendants to continue the women's tennis and softball program or to add athletic opportunities for women. Importantly, Defendants could choose to allocate its budget and athletic opportunities more equitably merely by shifting its longstanding favoritism toward men to a more equal allocation between men and women. Meanwhile, Defendants will gain public

relations and enrollment advantages by coming into compliance with Title IX and by offering more opportunities for its female students.

73. The injunctive relief that Plaintiffs request will promote the public interest in that it will increase educational opportunities for female students, will end sex discrimination at EMU, and will promote compliance with federal law. Congress decided that such nondiscrimination is in the public interest when it enacted Title IX. It has reaffirmed that public interest over the past 40 years by defeating each and every attempt that has been made to weaken Title IX. Equal opportunity for all students - male and female - is at the core of this case, is at the core of American identity, and is clearly in the public interest.

## COUNT I
## Title IX
## (By the Women Plaintiffs and Plaintiff Class Against Defendant EMU and The Board of Regents)

74. Plaintiffs re-allege and incorporate by reference all of the foregoing allegations.

75. The Plaintiffs bring this claim as a class action as set forth in the Class Allegations.

76. By offering certain opportunities to male students to participate in intercollegiate athletics, Defendant EMU has demonstrated its belief that athletic opportunities provide educational benefits that should be supported by the

University. Plaintiffs agree that athletic opportunities provide valuable educational benefits. For this very reason, the Plaintiffs—and the class they represent—should have equal access and opportunity to receive the benefits that the male students at EMU receive from intercollegiate athletics. EMU historically has not provided and currently does not provide its female students with such equal access and opportunity.

77. Defendant EMU determines the number of athletic participation opportunities that it will provide to male and female students by choosing which sports it will offer to each sex by deciding how many athletes it will allow to participate on each sports team.

78. Defendants fail to provide female students an equal opportunity to participate in varsity intercollegiate athletics in violation of Title IX and 34 C.F.R A §106.41(c)(1).

79. Defendants fail to comply with each prong of the three-part test described above. In particular:

(1) The ratio of female to male athletes at EMU is not substantially proportionate to the overall ratio of female to male undergraduate students at Defendant.

(2) EMU does not have a history or continuing practice of athletics program expansion for women.

(3) EMU has failed to fully and effectively accommodate the athletic interests and abilities of its female students by, among other things, eliminating their opportunity to participate in varsity tennis and softball.

80. According to information provided by Defendants to the federal government in its annual Equity in Athletics Disclosure Act reports, Defendants' female undergraduate enrollment rate is approximately 60% while its female athletic participation rate is only about 44%. Furthermore, on information and belief, Defendants underreport male participation in varsity athletics and overreports female participation. Defendants do not provide female students with varsity athletic participation opportunities in a number substantially proportionate to female undergraduate enrollment.

81. Defendants failed to meet the 1978 regulatory deadline for compliance with Title IX's requirement for equity in athletic participation opportunities. Defendant EMU has never met its compliance obligations and has not added any new female varsity sports in over 10 years. Defendants cannot show a history or continuing progress of program expansion for women. Instead, by eliminating women's varsity tennis and softball, the Defendants have s gone backwards.

82. Plaintiffs have the interest and ability to participate in women's varsity tennis and softball. High school students (the source of Defendants' incoming, prospective, and future students) also have the interest and ability to participate in tennis and softball. Competition exists in tennis and softball, because it is a major NCAA sport and EMU has offered the sport for many years—as have other schools in the Mid-American Conference.

83. Defendants will exacerbate its existing pattern and practice of sex discrimination in its allocation of athletic participation opportunities if it is not restrained from eliminating female athletic participation opportunities in varsity tennis and softball.

84. Plaintiffs seek a declaration that Defendants discriminate on the basis of sex by failing to offer female students an equal opportunity to participate in intercollegiate athletics.

85. Plaintiffs seek expedited preliminary and permanent injunctive relief requiring Defendants to stop discriminating in the operation of its athletic department and ordering Defendant not to eliminate tennis, softball, or any women's varsity athletic team or opportunity.

86. As a result of Defendants' discriminatory actions, the Plaintiffs have been denied and/or imminently will be denied their civil right to pursue an equal opportunity to participate in varsity intercollegiate athletics. They have been denied the educational, economic, physical, psychological, and social benefits of athletic participation. They have incurred or imminently will incur economic and compensatory damages associated with, among other things, lost opportunities, applying/transferring to other schools, moving to other schools, transferring/losing graduation credits, emotional distress, lost self-esteem, humiliation, and the denial of equal opportunity because of sex.

87. If Defendants are not restrained from eliminating the women's varsity tennis and softball program, all of these female athletes will forever lose the opportunity to participate in intercollegiate sports—an opportunity that lasts only four years in a lifetime but has lifelong educational, economic, physical, psychological, and social benefits.

**COUNT II**
**Equal Protection**

88. Plaintiffs re-allege and incorporate by reference all of the foregoing allegations.

89. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution mandates that "No state shall… deny to any person within its jurisdiction the equal protection of the law."

90. The Amendment is enforceable through 42. U.S.C. § 1983, which provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

91. By Defendants choosing to treat male and female athletes differently by reducing the number of opportunities for females intentionally discriminated on the

basis of sex and deprives female student-athletes of their right to equal protection secured by the Fourteenth Amendment.

92. As detailed herein, when Defendants engaged in the improper actions described above, they acted under color of law for purposes of the Equal Protection Clause and 42 U.S.C. § 1983.

93. Plaintiffs will be harmed by Defendants' conduct because they will forever lose their opportunity to compete in their sport.

94. Plaintiffs notified Defendants that they were violating their rights based upon their gender and asked Defendants not to go forward with eliminating the programs of women's tennis and softball, but Defendants refused.

95. The unequal, disparate treatment of female athletes, as detailed above, demonstrates Defendants' intentional decision to discriminate on the basis of sex and not to comply with its constitutional obligations.

**ATTORNEYS' FEES AND COSTS**

96. Plaintiffs have been required to retain attorneys to prosecute all claims in this action. Recovery of the costs of such prosecution, including reasonable attorneys' fees and fees of experts, may be allowed to the prevailing party by the Court in its discretion pursuant to 42 U.S.C. § 1988 (b) and (c).

97. Plaintiffs claim entitlement to recovery of their costs, including but not limited to reasonable attorneys' fees and expert fees, should Plaintiffs prevail in their action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A. Certify the first claim as a class action on behalf of all present, prospective, and future female students at EMU who seek to participate in varsity intercollegiate tennis, softball, or any other sport not currently offered by EMU;

B. Enter an order declaring that Defendants have engaged in a past and continuing pattern and practice of discrimination against female students on the basis of sex in the operation of its athletic program, in violation of Title IX and the regulations promulgated thereunder;

C. Issue preliminary and permanent injunctions from continuing to discriminate against female students on the basis of sex, restraining Defendants from eliminating the women's tennis and softball programs (or any women's athletic opportunities), and requiring Defendant to provide females with an equal opportunity to participate in varsity intercollegiate athletics by sponsoring additional women's varsity athletic opportunities based upon the interests and abilities of Defendant's present, prospective, and future students;

D. Maintain jurisdiction over this action to monitor Defendants' compliance with this Court's orders;

E. Award the Student Plaintiffs compensatory damages and other monetary relief as permitted by law, compensation for substantial injury associated with, among other things, lost professional status and reputation, lost opportunities for employment and professional acclaim, costs of seeking opportunities at other schools, lost past and future employment, lost compensation and benefits, humiliation, emotional pain and distress, lost self-esteem and other injuries set forth in this Complaint, in an amount to be determined at trial.

F. Award Plaintiffs their reasonable attorneys' fees and expenses; and

G. Order such other and further relief as the Court deems appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY AS TO ALL ISSUES TRIABLE BY A JURY.**

Dated: June 15, 2018

Respectfully submitted,

/s Tracy E. Van den Bergh

Tracy E. Van den Bergh (P70066)
Roberts & Freatman
125 N. Huron Street
Ypsilanti, MI 48197
(734) 483-4166
(734) 483-4368 (Fax)
Email: tracy@roberts-freatman.com

(To be admitted *pro hac vice*)
NEWKIRK ZWAGERMAN, PLC

/s Jill M. Zwagerman

Jill Zwagerman, AT0000324
Beatriz Mate-Kodjo AT0012331
Lori Bullock AT0012240
NEWKIRK ZWAGERMAN
521 E. Locust Street, Suite 300
Des Moines, IA 50309
Telephone: 515-883-2000
Fax: 515-883-2004
Email: jzwagerman@newkirklaw.com
Email: bmate-kodjo@newkirklaw.com
Email: lbullock@newkirklaw.com

ATTORNEYS FOR PLAINTIFFS