UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARIE MAYEROVA and ARIANA CHRETIEN, individually and on behalf of all those similarly situated** | : | Case No. 18-cv- 11909-GCS-RSW |
| | : | |
| Plaintiff, | : | Hon.  George Caram Steeh |
| | : | Mag.   R. Steven Whalen |
| v. | : | |
| | : | **DEFENDANTS' BRIEF IN** |
| **EASTERN MICHIGAN UNIVERSITY, JAMES SMITH, SCOTT WETHERBEE, and THE BOARD OF REGENTS,** | : | **OPPOSITION** |
| | : | **TO PLAINTIFFS' MOTION** |
| | : | **FOR TEMPORARY** |
| | : | **RESTRAINING ORDER** |
| | : | **AND FOR PRELIMINARY** |
| Defendants. | : | **INJUNCTION** |
| | : | |

ROBERTS & FREATMAN
*Attorneys for Plaintiffs*
Tracy E. Van den Bergh (P70066)
125 N. Huron Street
Ypsilanti, MI 48197
(734) 483-4166
(734) 483-4368 (Fax)
tracy@roberts-freatman.com

NEWKIRK ZWAGERMAN
*Attorneys for Plaintiffs*
Jill Zwagerman, AT0000324
Beatriz Mate-Kodjo AT0012331
Lori Bullock AT0012240
521 E. Locust Street, Suite 300
Des Moines, IA 50309
Telephone: 515-883-2000
Fax: 515-883-2004
jzwagerman@newkirklaw.com
bmate-kodjo@newkirklaw.com
lbullock@newkirklaw.com

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
Brian M. Schwartz (P69018)
Robert T. Zielinski
Megan P. Norris (P39318)
Jacob Hogg (P81275)
*Attorneys for Defendants*
150 West Jefferson, Suite 2500
Detroit, Michigan  48226
(313) 963-6420
schwartzb@millercanfield.com
zielinski@millercanfield.com
norris@millercanfield.com
hogg@millercanfield.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................... iii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ........................... vii

STATEMENT OF ISSUES PRESENTED........................................ viii

I.     INTRODUCTION ...................................................1

II.    RELEVANT FACTS................................................2

     A.    Eastern Michigan University Decides to Cut Four Sport Teams in Response to Budget Constraints and Balancing Academic Priorities ............................................2

     B.    Steps Taken Following the Announcement ........................3

     C.    Background Information Regarding Plaintiffs......................7

     D.    Plaintiffs' Class-Based Allegations..............................9

III.   PROCEDURAL HISTORY .......................................10

IV.   ARGUMENT....................................................10

     A.    Standard of Review .........................................10

     B.    Plaintiffs Cannot Receive Preliminary Injunctive Relief Because They Seek to Modify, Not Preserve, the Status Quo..........11

     C.    Plaintiffs Have Not Demonstrated an Entitlement to Emergency Injunctive Relief.............................................13

          1.    Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits .........................................13

               a.    The Supreme Court Has Foreclosed Plaintiffs' Ability to Bring a Private Right of Action Asserting a Claim of Non-Intentional Discrimination ....................................13

               b.    Plaintiffs Provide No Factual Evidence Establishing a Likelihood of Success on the Merits......21

               c.    Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits by Challenging Time-Barred Actions........................................23

          2.    Plaintiffs Cannot Establish Irreparable Harm.........................24

# TABLE OF CONTENTS

**Page**

3.    Granting Injunctive Relief Would Cause Substantial
        Harm to Others.........................................................................28

4.    The Public Interest Favors Denying Plaintiffs' Request .........29

V.    CONCLUSION................................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*,
  727 F.3d 502 (6th Cir. 2013) ...............................................................................22

*Ability Center of Greater Toledo v. City of Sandusky*,
  385 F.3d 901 (6th Cir. 2004) ......................................................................18, 20

*Advance America v. FDIC*,
  257 F. Supp. 3d 56 (D.D.C. 2017)......................................................................21

*Apex Tool Grp. v. Wessels*,
  119 F. Supp. 3d 599 (E.D. Mich. 2015) (Steeh, J.) ...........................................11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................................22

*Beidinger v. Quinnipiac Univ.*,
  691 F.3d 85 (2d Cir. 2012) .................................................................................20

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................22

*Bonnell v. Lorenzo*,
  241 F.3d 800 (6th Cir. 2001) .............................................................................11

*Cannon v. Univ. of Chicago*,
  441 U.S. 677 (1979)............................................................................................15

*Cohen v. Brown Univ.*,
  991 F.2d 888 (1st Cir. 1993)...............................................................18, 19, 22

*Communities for Equity v. Michigan High School Athletic Ass'n*,
  459 F.3d 676 (6th Cir. 2006) .............................................................................16

*Cox v. Jackson*,
  579 F. Supp. 2d 831 (E.D. Mich. 2008) ............................................................12

*In re De Lorean Motor Co.*,
  755 F.2d 1223 (6th Cir. 1985) ...........................................................................10

*Dibbern v. Univ. of Mich.*,
   2016 WL 2894491 (E.D. Mich. May 18, 2016) ...................................................23

*Doe v. Brown Univ.*,
   270 F. Supp. 3d 556 (D.R.I. 2017) .......................................................................9

*Doe v. The Ohio State Univ.*,
   136 F. Supp. 3d 854, 871 (S.D. Ohio 2016)........................................................28

*Equity in Athletics v. Dep't of Educ.*,
   504 F. Supp. 2d 88 (W.D. Va. 2007)..............................................................29, 30

*Equity in Athletics v. Dep't of Educ.*,
   291 F. App'x 517 (4th Cir. 2008)...................................................................25, 28

*Folkes v. New York College of Osteopathic Medicine*,
   214 F. Supp. 2d 273 (E.D.N.Y. 2002) ................................................................23

*Gjeka v. Delaware County Community College*,
   2013 WL 2257727 (E.D. Pa. May 23, 2013)........................................................23

*Gonzales v. Nat'l Bd. of Med. Examiners*,
   225 F.3d 620 (6th Cir. 2000) ..............................................................................13

*Gonyo v. Drake Univ.*,
   837 F. Supp. 989 (S.D. Iowa 1993) ....................................................................26

*Holden v. Owens-Illinois*,
   793 F.2d 745 (6th Cir. 1986) ..............................................................................17

*Horner v. Kentucky High School Athletic Ass'n*,
   206 F.3d 685 (6th Cir. 2000) ..............................................................................15

*Jackson v. Birmingham Bd of Educ.*,
   544 U.S. 167 (2005)............................................................................................15

*K.T. v. Culver-Stockton Coll.*,
   2016 WL 4243965 (E.D. Mo. Aug. 11. 2016)......................................................9

*Leary v. Daeschner*,
   228 F.3d 729 (6th Cir. 2000) ..............................................................................21

*Lillard v. Shelby County Board of Education*,
   76 F.3d 716 (6th Cir. 1996) ...............................................................23

*Livonia Prop. Holdings v. 12840-12976 Farmington Rd. Holdings*,
   717 F. Supp. 2d 724 (E.D. Mich. 2010), *aff'd*, 399 F. App'x 97
   (6th Cir. 2010)..................................................................................11

*Loewen v. Grand Rapids Med. Educ. Partners*,
   2012 WL 1190145 (W.D. Mich. Apr. 9. 2012).....................................9

*LRL Properties v. Portage Metro Housing Authority*,
   55 F.3d 1097 (6th Cir. 1995) ..............................................................23

*Manoharan v. Columbia College*,
   842 F.2d 590 (2d Cir. 1988) ...............................................................17

*Mayfield v. Miles*,
   2014 WL 5605301 (E.D. Mich. Nov. 4, 2014).....................................12

*Miller v. Univ. of Cincinnati*,
   2007 WL 2783674 (S.D. Ohio Sept. 21, 2007) ....................................25

*New Albany Tractor v. Louisville Tractor*,
   650 F.3d 1046 (6th Cir. 2011) ............................................................22

*Northeast Ohio Coalition for the Homeless v. Blackwell*,
   467 F.3d 999 (6th Cir. 2006) ..............................................................22

*Pierre v. Univ. of Dayton*,
   143 F. Supp. 3d 703, 713-14 (S.D. Ohio 2015)....................................25

*Ramik v. Darling Int'l*,
   161 F. Supp. 2d 772 (E.D. Mich. 2001) ...............................................11

*Roberts v. Colorado State Bd. of Agriculture*,
   998 F.2d 824 (10th Cir. 1993) .......................................................18, 19, 22, 29

*Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*,
   134 F.3d 749 (6th Cir. 1998) ..............................................................10

*Sandoval v. Alexander*,
   532 U.S. 275 (2001)......................................................................*passim*

*Texas Dept. of Community Affairs v. Burdine,*
   450 U.S. 248 (1981)................................................................17

*Theus v. Internal Revenue Serv. Criminal Investigation Div.,*
   2016 WL 406462 (E.D. Mich. Jan. 14, 2016) ....................................12

*Univ. of Tex. v. Camenisch,*
   451 U.S. 390 (1981)................................................................11

*Wells Fargo v. WhenU.com,*
   293 F. Supp. 2d 734 (E.D. Mich. 2003) ........................................25

*Wolfe v. Perry,*
   412 F.3d 707 (6th Cir. 2005) ...................................................23

**Michigan Cases**

*Regents of Univ. of Mich. v State,*
   47 Mich. App. 23; 208 N.W.2d 871 (1973) .....................................29

**Statutes**

§601 of Title VI, 42 U.S.C. §2000d........................................................15

§602 of Title VI, 42 U.S.C. §2000d-1 ...................................................14

§703 of Title VII, 42 U.S.C. §2000e-2(j) ................................................18

§901 of Title IX, 20 U.S.C. §1681....................................................*passim*

§902 of Title IX, 20 U.S.C. §1682........................................................19

MCL 600.5805(10) .........................................................................23

**Constitutional Provisions**

Const 1963, art 8, §§5, 6..................................................................29

**Regulations**

8 C.F.R. §214.2(f)(8) ......................................................................27

## Controlling or Most Appropriate Authority

*Ability Center of Greater Toledo v. City of Sandusky,* 385 F.3d 901 (6th Cir. 2004)

*Equity in Athletics v. Dep't of Educ*., 291 F. App'x 517 (4th Cir. 2008)

*Miller v. Univ. of Cincinnati,* 2007 WL 2783674 (S.D. Ohio Sept. 21, 2007)

*Sandoval v. Alexander*, 532 U.S. 275 (2001)

§901 of Title IX, 20 U.S.C. §1681

§902 of Title IX, 20 U.S.C. §1682

**Statement of Issues Presented**

Should the Court deny Plaintiffs' request for preliminary injunctive relief because Plaintiffs cannot establish a likelihood of success on the merits, that they will suffer irreparable harm in the absence of an injunction, or that the balance of harms weighs in their favor?

Defendants assert that the answer is "yes"

# I.    Introduction

In March 2018, Eastern Michigan University ("EMU" or the "University") made a difficult budgetary decision to eliminate four sports teams.  Two of the teams were men's teams and two were women's teams.  Seventy percent of the athletes in the cancelled programs were men, while only 30 percent were women.  Plaintiffs nonetheless filed this action alleging that this decision discriminated against women and thus violated Title IX.  Plaintiffs now seek extraordinary injunctive relief, asking the Court to reconstitute the already-disbanded women's teams.

Plaintiffs' motion fails for several reasons.  They cannot establish a likelihood of success on the merits because the Supreme Court has foreclosed their ability to bring a private right of action for non-intentional discrimination based on the "OCR Policy Interpretation" that forms the basis of their claims.  Their motion is also bereft of evidence, thereby preventing Plaintiffs from proving a likelihood of success.  Additionally, because Plaintiffs seek to address "historic Title IX wrongs," the bulk of their allegations are time-barred and the only actionable decision cannot plausibly constitute an intentionally discriminatory act "on the basis of sex" because it impacted more male students than female students.  Plaintiffs also ignore their delay in seeking injunctive relief – due to their inaction, too few athletes remain to field viable softball or tennis teams – and exaggerate the

irreparable harm they allegedly face by misrepresenting the facts and law regarding the supposed "transfer risks."  Finally, the balance of harms weighs in favor of denying Plaintiffs' request, because ordering the University to spend resources on recreating the two sports programs will harm other University students in the academic or sports programs where cuts will need to take place to balance out the expenditures.  EMU therefore asks the Court to deny Plaintiffs' request for preliminary injunctive relief.

## II.    Relevant Facts

**A.    Eastern Michigan University Decides to Cut Four Sport Teams in Response to Budget Constraints and Balancing Academic Priorities**

In recent years, the University has had to make many difficult decisions regarding how best to fulfill its academic mission in light of declining state support (nearly $10 million less per year than was received in 2003), population shifts (including declining high school enrollment in Michigan, which has resulted in a decline in student credit hours at universities), and enrollment shifts.  As a result, the University has operated with a budget deficit in each of the last seven years and has taken steps to reduce spending while still investing in new initiatives to position EMU for the future.  (Ex 1, Schwartz Dec, Exhibit C, University Response to Budget-Related Matters).

It was against this backdrop that the University made a decision to reduce overall athletics spending by $2M while making similar decisions in other areas to

align spending with overall academic priorities.  The decision to reduce athletics spending resulted in the elimination of four sports teams: men's wrestling, men's swimming and diving, women's softball, and women's tennis.[1]  Altogether, 83 student-athletes participated in these programs during the last academic year, of whom 58 or 70% were men and 25 or 30% were women.  (Ex 2, McCarthy Dec, ¶4). The University announced the decision publicly and to the affected student-athletes in March 2018 in order to permit the student-athletes and incoming students sufficient time to adjust their plans.  As part of the decision, the University assured all affected student-athletes that if they chose to remain at EMU they would continue to receive their athletic and academic scholarship aid and that EMU would facilitate transfer to other schools if the student elected to seek that option.  (Ex 1, Schwartz Dec, Exhibit A (Press Release) and Exhibit B (FAQ)).

**B.    Steps Taken Following the Announcement**

During the approximately three months since the University's announcement—and before the filing of this lawsuit—the University implemented its decision.  All fulltime coaches affiliated with the four discontinued sports terminated their employment months ago, and each signed a severance agreement around the date of termination.  For example, former softball head coach Melissa

---

[1] Prior to March 2018, the last time the EMU changed its sports offerings was in 2000, when it discontinued both men's tennis and men's soccer and added a women's rowing team.  (Ex 1, Schwartz Dec, Exhibit A).

Gentile was terminated effective May 11, 2018 and signed her severance agreement on April 27, 2018.  Additionally, upon information and belief, Gentile, sold her house and moved out of the state of Michigan.  Softball assistant coaches Magali Frezzotti and Kimberly Burke's respective employment also terminated effective May 11 and they signed severance agreements on April 30 and April 27, respectively.  Former tennis head coach Jayson Wiseman's employment terminated May 4 and he signed a severance agreement May 18.  (Ex 2, McCarthy Dec, ¶5).

On March 20, 2018, all committed prospective student-athletes who signed a National Letter of Intent ("NLI") with EMU for 2018-19 were contacted by email. (Ex 2, McCarthy Dec, Exhibit A).  That email encouraged the prospective students to attend the University and confirmed that "If you choose to attend EMU, your athletic and/or academic scholarships will be honored…."  (*Id.*)  It also explained that if the prospective student chose to attend another institution, EMU had taken steps with the NCAA to facilitate such action:

> Today, in order to facilitate your re-engagement in the recruiting process, EMU declared your National Letter of Intent null and void due to EMU's discontinuation of your sport. The NCAA has approved EMU's Null and Void request. This "null and void" allows you to contact other schools and coaches about pursuing a scholarship for the fall 2018 semester or thereafter.

(*Id.*)  Finally, the email encouraged the prospective students to contact the University with any questions or concerns.  (*Id.*)  In the past few months, at least 5 of the 7 prospective student-athletes who had committed to play softball signed a

NLI with or committed to play at another school.[2]  (Ex 2, McCarthy Dec, ¶6).

Similarly, at least 2 of the 3 prospective student-athletes who had committed to

play tennis signed a NLI or committed elsewhere.[3]  (*Id.*)

On March 20, the University also met with all affected current student-

athletes and provided them information on next steps.  In an email, the University

explained that it was encouraging each student to remain at the University to

graduate and confirmed that "[y]our athletic and/or academic scholarships will be

honored if you continue to progress towards your degree."  (Ex 2, McCarthy Dec,

Exhibit B).  The email also provided information on student-athletes wishing to

transfer elsewhere:

> If you choose to pursue your academic and athletic careers elsewhere,
> we will support you in any way possible. **The attached letter grants
> you permission to contact other institutions about transferring, if
> you so choose**. As long as you are academically eligible per NCAA
> rules, you will be immediately eligible at any other institution. You
> can forward the Permission to Contact Letter to any NCAA or NAIA
> institution to facilitate discussions on transferring, and it will be sent
> out to every NCAA conference on your behalf.

(*Id.* (emphasis in original).).   The email included (a) a letter permitting other

NCAA institutions to contact members of the affected sports teams as well as (b) a

"frequently asked questions," or "FAQ," answering certain questions that the

---

[2] One prospective student-athlete appears to be attending another institution based
on her twitter profile. (Ex 2, McCarthy Dec, ¶6). The University has not been able
to determine if the seventh prospective student-athlete has committed elsewhere.
[3] The University has not been able to determine if the third prospective student-
athlete has committed elsewhere.

student-athletes may have. (*Id.*).

Regarding the impact that the discontinuation of sports had on NCAA eligibility, the FAQ explained, "This does not impact your seasons of eligibility" and encouraged the student-athlete to contact the EMU Athletics Compliance Office with questions. (*Id.*) The FAQ also encouraged student-athletes to contact the Compliance Office for assistance with the transferring process. (*Id.*) Additional support information was also provided. (*Id.*)

At the time of the March announcement, there were 17 student-athletes on the softball team, four of whom exhausted their NCAA eligibility with the 2018 spring season. At least one student-athlete is transferring. Only 5 student-athletes (including Plaintiff Ariana Chretien) have indicated an intent to return to the University in 2018-19 to continue their studies. (Ex 2, McCarthy Dec, ¶8). Thus, there are insufficient student-athletes available to field a viable softball team.[4]

The same is true for tennis. Of the 8 women on the tennis team in 2017-18, 5 exhausted their NCAA eligibility in spring 2018. Only 2 student-athletes (including Plaintiff Marie Mayerova) have indicated an intent to return to the University to continue their studies. (Ex 2, McCarthy Dec, ¶9). Again, due to the decisions of incoming student-athletes to transfer elsewhere, there are insufficient

---

[4] According to the websites of other Mid-American Conference ("MAC") schools, the smallest softball rosters had 17 players (Ohio University, Buffalo, Akron).

student-athletes to field a viable tennis team.[5]

The Mid-American Conference ("MAC") has also moved forward and planned the schedule for the 2019 softball season. Specifically, on June 8, 2018, the MAC released an "as is" softball schedule that does not include EMU. (Ex 3, Softball Schedule). Additionally, due to the discontinuation, the University has not scheduled non-conference games or matches for either sport, and the passage of time increases the difficulty of compiling a competition schedule.

All softball and tennis apparel and uniform orders for 2018-19 were cancelled by the equipment staff and the bulk of any apparel in inventory has been given away. (Ex 2, McCarthy Dec, ¶11). For softball, the University gave away entire sets of uniforms or a significant number of uniforms in a particular set, to alumni and student-athletes that were on the team in 2017-18. (*Id.*) If the University were required to reverse its already-implemented decision, it would have to order multiple sets of uniforms, as well as other practice gear, apparel, and footwear, to outfit the teams appropriately. (*Id.*)

## C.    Background Information Regarding Plaintiffs

Although Plaintiffs purport to bring this lawsuit on behalf of a class, they confine their sparse factual assertions in support of their motion to two individual

---

[5] According to the USTA, on average most tennis teams carry 8-12 members. (*See* https://www.usta.com/content/dam/usta/pdfs/Interested_in_Playing_College_Tennis.pdf).

student-athletes: Marie Mayerova and Ariana Chretien.

Mayerova is a "rising senior," who was recently on the tennis team. Mayerova admits that she received expressions of interest from other schools regarding a potential transfer, but asserts that she "does not have the resources to effectively transfer." (Dkt#1, Compl, ¶14). She does not, however, provide any facts to demonstrate that she would have been unable to transfer to a new school. For example, although she speculates that she might suffer "loss of course credits," (*id.*, ¶14), she does not provide any specific information for Defendants or the Court to evaluate this conclusory assertion. Mayerova asserts that she relies on her athletic scholarship, (Dkt#2, Mayerova Dec, ¶17), but does not contest that the University has committed to honoring her scholarship, (*see id.*).

Chretien just completed her sophomore year and was a member of the softball team. Similar to Mayerova, Chretien "received interest from other schools." (Dkt#1, Compl, ¶16). She asserts that she is limited in her ability to transfer "because the aviation major is not offered at many schools." (*Id.*) Chretien does not, however, provide any facts to allow Defendants or the Court to determine whether she has actually received an offer, or otherwise attempted, to transfer and play softball at another school. Additionally, although Chretien asserts that she would be unable to transfer because she is studying aviation, (Dkt#2, Chretien Dec, ¶8), a cursory search reveals there are at least a dozen other

schools that both field a Division I softball team and provide an aviation major, including Western Michigan University and others in the Midwest.[6]

## D.     Plaintiffs' Class-Based Allegations

Plaintiffs seek to represent an extraordinarily broad (and vaguely defined) class composed of not just recent or potential members of the softball and tennis teams, but also those "who want to participate in other varsity sports not offered to women by EMU."[7]   (Dkt#1, Compl, ¶26).   They also seek to represent students "who are deterred from enrolling at EMU" because the University does not offer certain sports.   (*Id.*)   In effect, Plaintiffs ask the Court to take over as EMU's Athletic Director for years to come, deciding in which sports teams will be added or cut, which roster spots and scholarships will be available, and a myriad of other matters that must be considered in running a Division I collegiate athletics program.   (*See, e.g., id.*, ¶69, Prayer For Relief, ¶¶C-D).

---

[6]      (https://www.collegexpress.com/lists/list/colleges-with-excellent-programs-in-aviation-flying/115/)

[7] Although not at issue in the instant motion, Plaintiffs' proposed class seeks to include individuals (non-students who have never applied to EMU) who are not proper parties to a Title IX claim.  *Loewen v. Grand Rapids Med. Educ. Partners*, 2012 WL 1190145, at *12 (W.D. Mich. Apr. 9. 2012) (finding no Title IX liability where plaintiff "offer[ed] no evidence to show that she was an MSU student"); *K.T. v. Culver-Stockton Coll.*, 2016 WL 4243965, *4-5 (E.D. Mo. Aug. 11. 2016) (holding non-student who was assaulted on campus while visiting university as a soccer recruit had no standing to bring Title IX claim); *Doe v. Brown Univ.*, 270 F. Supp. 3d 556 (D.R.I. Sept. 6, 2017) (holding non-student who was assaulted on university campus had no standing to pursue Title IX claim).

### III.   Procedural History

On June 6, 2018, Plaintiffs' counsel sent the University a letter threatening a lawsuit unless EMU immediately reinstated the tennis and softball programs by one week later, June 13.  As with their Complaint and Affidavits, the letter did not provide any facts to support Plaintiffs' belief that the University's decision to eliminate two men's and two women's sports violated Title IX.  On June 13, 2018, the University confirmed that it would not voluntarily reinstate the programs. Plaintiffs filed their Complaint and Motion two days later.

### IV.   Argument

#### A.   Standard of Review

In evaluating a motion for a temporary restraining order or a preliminary injunction, the court considers four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction."  *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998).   "[T]he four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met."  *In re De Lorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).  The movant bears the burden of establishing

these elements. *Livonia Prop. Holdings v. 12840-12976 Farmington Rd. Holdings,* 717 F. Supp. 2d 724, 731 (E.D. Mich. 2010), *aff'd,* 399 F. App'x 97 (6th Cir. 2010).

"[T]he preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Apex Tool Grp. v. Wessels,* 119 F. Supp. 3d 599, 606 (E.D. Mich. 2015) (Steeh, J.) (quoting *Leary v. Daeschner,* 228 F.3d 729, 739 (6th Cir. 2000) (internal quotation marks omitted)). "A preliminary injunction is reserved for only the most egregious case, and should not be extended to cases which are doubtful or do not come within well-established principles of law." *Bonnell v. Lorenzo,* 241 F.3d 800, 826 (6th Cir. 2001).

**B.   Plaintiffs Cannot Receive Preliminary Injunctive Relief Because They Seek to Modify, Not Preserve, the Status Quo.**

The Supreme Court has made clear that the primary purpose of emergency injunctive relief is "to preserve the relative positions of the parties" until a merits determination can be made. *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981); *see Ramik v. Darling Int'l,* 161 F. Supp. 2d 772, 778 (E.D. Mich. 2001). This Court has thus held that there are "three types of *particularly disfavored* preliminary injunctions: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the

merits." *Cox v. Jackson*, 579 F. Supp. 2d 831, 855 n.8 (E.D. Mich. 2008) (emphasis added) (internal quotation marks omitted); *Mayfield v. Miles*, 2014 WL 5605301, at *5 (E.D. Mich. Nov. 4, 2014) (same); *Theus v. Internal Revenue Serv. Criminal Investigation Div.*, 2016 WL 406462, at *4 (E.D. Mich. Jan. 14, 2016) (same), *report and recommendation adopted*, 2016 WL 393176 (E.D. Mich. Feb. 2, 2016).[8]

Under this well-established precedent, Plaintiffs' requested emergency injunctive relief is multiply disfavored. **<u>First</u>**, they seek to alter the status quo by undoing an already-implemented decision rather than forestalling its implementation. **<u>Second</u>**, Plaintiffs seek a mandatory injunction, affirmatively requiring the University to "sponsor[] additional women's varsity athletic opportunities" beyond resurrecting a softball or tennis program. (Dkt#3-1, Pl's Br at 25). **<u>Third</u>**, a preliminary injunction requiring the University to reestablish tennis and softball teams or add other women's sports would give Plaintiffs the ultimate relief that they could recover at the conclusion of a full trial on the merits. Accordingly, Plaintiffs' request for injunctive relief here "must be more closely scrutinized than the already-disfavored motion for preliminary junction which seeks to maintain the status quo." *Cox*, 579 F. Supp. 2d at 855 n.8.

---

[8] Unpublished cases are attached as Exhibit 4.

C.   **Plaintiffs Have Not Demonstrated an Entitlement to Emergency Injunctive Relief**

1.   **Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits**

"Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Michigan State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) ("[A] preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed.")). Here, there are several critical flaws with Plaintiffs' legal theories and the meager evidence they submit in support of their request that the Court reverse the University's implemented decision.

a.   **The Supreme Court Has Foreclosed Plaintiffs' Ability to Bring a Private Right of Action Asserting a Claim of Non-Intentional Discrimination**

Plaintiffs' Complaint and Motion suffer from a fatal flaw: the Supreme Court has foreclosed the ability to bring a private cause of action based on the "OCR Policy Interpretation" that forms the entire basis for Plaintiffs' legal theories. In *Sandoval v. Alexander*, 532 U.S. 275 (2001)*,* the Court held that the private right of action under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d, *et seq.*, is limited to claims for intentional discrimination, and that there is no private right of action to enforce regulations that impose obligations which are not directly imposed by the statute. Specifically, *Sandoval* involved a challenge to

Alabama's decision to provide driver's license exams only in English. The plaintiff claimed that the decision violated §601 of Title VI because it had a disparate adverse impact based on national origin and race, and pointed to administrative regulations that prohibited practices having the effect of discriminating on account of national origin. The district court enjoined the English-only rule, and the Eleventh Circuit affirmed. *Id.* at 279.

The Supreme Court reversed, holding first that §601 created a private right of action only for intentional discrimination. 532 U.S. at 280. Second, the Court held that the regulations prohibited conduct – disparate-impact discrimination – that was not itself prohibited by §601's ban on intentional discrimination. *Id*. at 285-86. As a result, the Court held that the private right of action implied under §601 could not be used to enforce the regulation's disparate-impact ban. The Court then held that a suit to enforce the regulation could be allowed only if the statutory section authorizing the agency to issue regulations, §602, 42 U.S.C. §2000d-1, itself implied the existence of a private right of action. *Id.* Finally, the Court held that the language of §602 did not create an implied private cause of action. The Court relied on the absence of any "rights-creating language" in §602, as well as the fact that §602 contained detailed procedures for administrative enforcement of any regulations promulgated, which rather than provide a private right of action, "suggest[ed] the opposite." *Id.* at 288-89.

*Sandoval* is directly applicable here, notwithstanding that the Court interpreted Title VI and not Title IX.  The language of Title VI and Title IX is nearly identical, and Title IX was consciously modelled after Title VI.  Thus the two laws have always been interpreted in *pari materia*.  *Cannon v. Univ. of Chicago,* 441 U.S. 677, 696-703 (1979) ("We have no doubt that Congress intended to create Title IX remedies comparable to those available under Title VI…").  As noted in *Cannon,* §901 of Title IX, 20 U.S.C. §1681, is identical to §601 of Title VI, 42 U.S.C. §2000d.  *Id.* at 695 ("Except for the substitution of the word 'sex' in Title IX to replace the words 'race, color, or national origin' in Title VI the two statutes are identical …").  Additionally, like §601, §901 prohibits only intentional discrimination.  *Jackson v. Birmingham Bd of Educ.,* 544 U.S. 167, 174 (2005) (private right of action under Title IX exists for retaliation for filing a complaint of sex discrimination because retaliation "constitutes intentional 'discrimination' 'on the basis of sex'"); *Horner v. Kentucky High School Athletic Ass'n,* 206 F.3d 685, 692 (6th Cir. 2000) (concluding that intent requirement applies).  Thus, as in *Sandoval*, the statutory provision on which Plaintiffs base their implied private right of action is limited to claims of intentional discrimination.

As in *Sandoval*, Plaintiffs base their claim not on intentional discrimination, but rather on regulatory guidance that would prohibit conduct which is not itself

prohibited by the statute's ban on intentional discrimination.  Specifically, the only decision challenged by Plaintiffs is a decision to implement budget-reducing cuts. But EMU clearly did not intentionally discriminate against female student-athletes, as the cuts fell harder on males.  "Disparate treatment does not arise from any and all differences in treatment; it occurs only where the offending party '*treats some people less favorably* than others because of their race, color, religion, sex, or national origin." *Communities for Equity v. Michigan High School Athletic Ass'n,* 459 F.3d 676, 695 (6th Cir. 2006) (quoting *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335, n.15 (1977)) (emphasis added by 6th Circuit).  Here, Plaintiffs cannot show that EMU treated them less favorably than male athletes, and they therefore have not and cannot plead that EMU intentionally discriminated against them on the basis of their gender.

Unable to plead intentional discrimination under the actual Title IX statute, Plaintiffs instead seek relief under the OCR Policy Interpretation.  But their attempt to do so is barred by *Sandoval* because the Policy Interpretation goes beyond §901's prohibition against intentional discrimination and the statute authorizing the regulations does not permit an implied private right of action. Plaintiffs acknowledge that the overall effect of the University's March 2018 decision was to actually *reduce* any statistical disparity between men's and women's participation opportunities, (*see* Dkt#1, Compl, ¶33), but insist that the

decision nonetheless violates the Policy Interpretation because some smaller gender disparity allegedly still remains.  They essentially contend that the Policy Interpretation requires EMU to eliminate only men's sports to meet its budget constraints unless total statistical proportionality is achieved.  Assuming that the Department of Education ("DOE") has authority under §902 to require schools to engage in such a species of affirmative action, [9] the failure to engage in affirmative action or other diversity-encouraging conduct is not intentional discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 258-59 (1981) (Title VII's ban on intentional discrimination "does not require an employer to restructure his employment practices to maximize the number of minorities and women hired."); *Holden v. Owens-Illinois,* 793 F.2d 745, 749 (6th Cir. 1986) ("Title VII does not require the adoption of affirmative action programs"); *Manoharan v. Columbia College,* 842 F.2d 590, 594 (2d Cir. 1988).  Indeed, Title IX, like Title VII, expressly prohibits an interpretation that would require preferential treatment on account of statistical disparities between participants and members of any community at large.  Title IX states that:

> Nothing contained in [§1681(a)] shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported

---

[9] For purposes of the instant motion, the University assumes that the Policy Interpretation is a legitimate exercise of the DOE's authority under §902.

program or activity, in comparison with the total number or percentage of person of that sex in any community, State, section or other area: provided that [consideration of statistical evidence of imbalances will be allowed.]

20 U.S.C. §1681(b).  *See also* 42 U.S.C. §2000e-2(j) (Title VII).  By prohibiting EMU from making a decision which favors women over men, solely because it does not favor women "enough," Plaintiffs' application of the Policy Interpretation goes beyond a prohibition of intentional discrimination.  Whether one terms that "affirmative action," disparate impact analysis, or a remedy for discrimination by society at large, a failure to provide preferential treatment based on gender is not intentional discrimination.[10]

Because the Policy Interpretation goes beyond the requirements of §901, a private action to enforce the Policy Interpretation is allowable only if the statutory provision authorizing the issuance of the Policy Interpretation itself implies the existence of a private right of action.  *Sandoval,* 532 U.S. at 285-86; *Ability Center of Greater Toledo v. City of Sandusky,* 385 F.3d 901, 913-14 (6th Cir. 2004) (regulation under Title II of the Americans with Disabilities Act which "creates obligations not necessarily required by [the statute]" are not enforceable via a

---

[10] Even the cases Plaintiffs rely upon, while not addressing whether a private right of action exists, have acknowledged that "a Title IX violation may not be predicated solely on a disparity between the gender composition of an institution's athletic program and the gender composition of its undergraduate enrollment." *Roberts v. Colorado State Bd. of Agriculture*, 998 F.2d 824. 831 (10th Cir. 1993). *See also Cohen v. Brown Univ.,* 991 F.2d 888, 895 (1st Cir. 1993) (same).

private right of action, even though a valid exercise of regulatory authority).  Here, §902, the source of DOE's authority to promulgate (and enforce) regulations, does not permit a private right of action.  In relevant part, §902 (titled in part "Federal administrative enforcement") states:

> Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity … is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken.

20 U.S.C. §1682.  It then details the mechanisms for approval and enforcement of any regulation.  *Id.*  Section 902 is identical in all material respects to the rules authorizing provision of Title VI, §602.[11]  *Sandoval* held that §602 could not support an implied private right of action.  Consequently, given the identical language of §902, it too does not permit a private right of action.

The cases relied upon by Plaintiffs are not applicable.  *Roberts v. Colorado State Board of Agriculture*, 998 F.2d 824, 829 (10th Cir. 1993) and *Cohen v. Brown University*, 991 F.2d 888 (1st Cir. 1993) were decided prior to *Sandoval*.  Neither requires a Title IX plaintiff to show intentional discrimination and each applies the Policy Interpretation without engaging in the analysis mandated by *Sandoval*.  Thus, the rationale from either case does not survive *Sandoval*.

---

[11] The only difference between §602 and §902 is the insertion of the word "education" to modify "program or activity."

Plaintiffs' third case, *Beidinger v. Quinnipiac Univ.,* 691 F.3d 85 (2d Cir. 2012), while decided after *Sandoval*, refused to consider fully the ramifications of *Sandoval*, as it had been raised solely by an amicus and not adopted by either party. 691 F.3d at 97. Moreover, to the extent *Beidinger* discussed how it might view *Sandoval*, it limited *Sandoval*'s holding to a prohibition on disparate-impact claims. *Id.* This is contrary to the Sixth Circuit's holding in *Ability Center of Greater Toledo*, which expressly held that *Sandoval* applies whenever there is a question whether a regulation is privately enforceable. 385 F.3d at 906, 913.

In summary, *Sandoval* makes three things clear. First, §901 of Title IX, prohibits only intentional discrimination based on gender. Second, §902 of Title IX, which authorizes the DOE to issue and enforce regulations, does not support an implied private right of action based on those regulations. Third, as a result, regulations adopted under §902, which impose duties or liabilities that exceed those of §901 are not enforceable by a private litigant. This is exactly the case with Plaintiffs' claim here.

This case is indistinguishable from *Sandoval*. Both involve attempts to imply a private right of action from regulations or sub-regulation-level administrative policy guidance that expand the obligations of a federal funds recipient beyond that required by the statute. Even if that expansion is a legitimate exercise of the authority granted the agency for purposes of its administrative

enforcement of the law, a private cause of action is not allowed.

> **b. Plaintiffs Provide No Factual Evidence Establishing a Likelihood of Success on the Merits**

Unlike on a motion to dismiss, on a motion for preliminary injunction the allegations in Plaintiffs' Complaint are not entitled to the presumption of truth. On a motion for preliminary injunction, a plaintiff must *prove* with evidence – not merely plead – a likelihood of success on the merits. *Advance America v. FDIC*, 257 F. Supp. 3d 56, 64 (D.D.C. 2017) (comparing applicable standards between a motion for a preliminary injunction and a motion to dismiss). Indeed, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d at 739. Here, even if Plaintiffs could overcome *Sandoval* and pursue a private right of action based on the regulations, they do not produce any non-conclusory evidence to prove a likelihood of success on the merits.

Plaintiffs' motion is based on speculation and assumptions, not facts or admissible evidence. Indeed, their central allegations are made only "on information and belief." For example, the Complaint alleges "on information and belief" that male students are provided more opportunities than female students. (Dkt#1, ¶56). Similarly, Plaintiffs allege "on information and belief" that Defendants underreport male participation and "do not provide female students with varsity athletic participation opportunities in a number substantially

proportionate to female undergraduate enrollment." (*Id.*, ¶80). But they provide no admissible evidence to support these allegations,[12] and Plaintiffs' "speculation is insufficient to satisfy plaintiffs' burden of demonstrating a strong likelihood of success on the merits."[13] *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1011 (6th Cir. 2006).

In short, while Plaintiffs disagree with the University's decision to eliminate softball and tennis, and speculate that there is a Title IX violation, their disagreement and speculation are insufficient to demonstrate a likelihood of success on the merits.

---

[12] Plaintiffs' reliance on *Biedliger*, *Roberts*, and *Cohen* is misplaced. In each case, the student-athletes presented detailed factual evidence. *See, e.g., Roberts*, 998 F.2d at 829 (describing a "substantial quantity of statistical evidence"); *Biedliger*, 616 F. Supp. at 280-91 (same); *Cohen*, 809 F. Supp. at 980-82.

[13] Plaintiffs' limited factual support would not be sufficient to survive a Rule 12(b)(6) motion to dismiss under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). This is because allegations based upon "information and belief" must be disregarded since they "are precisely the kinds of conclusory allegations that *Iqbal* and *Twombly* condemned and thus told [courts] to ignore when evaluating a complaint's sufficiency." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013). Moreover, Plaintiffs cannot rely on conclusory allegations to commence discovery because "Rule 8 … does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions," *Iqbal*, 556 U.S. at 678-79. *See also New Albany Tractor v. Louisville Tractor*, 650 F.3d 1046, 1051 (6th Cir. 2011)("plaintiff must allege specific facts [to support a plausible claim] even if those facts are only within the head or hands of the defendants. The plaintiff may not use the discovery process to obtain these facts after filing suit. The language of *Iqbal*, 'not entitled to discovery,' is binding on the lower federal courts.")

### c.    Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits by Challenging Time-Barred Actions

Plaintiffs also cannot show a likelihood of success on the merits because their challenges to decades-old actions are barred by the statute of limitations. For example, Plaintiffs allege "historic Title IX wrongs," (Dkt#1, Compl, ¶2), and refer to opportunities that the University "historically has not provided," (*id.*, ¶76. *See also id.*, ¶81 (relying on a failure to meet an alleged 1978 deadline to support claim)). Plaintiffs cannot, however, rely upon pre-limitations actions to demonstrate a likelihood of success on the merits.

The statute of limitations for each of Plaintiffs' claims is three years. MCL 600.5805(10); *Lillard v. Shelby County Board of Education*, 76 F.3d 716, 729 (6th Cir. 1996) (Title IX); *Wolfe v. Perry*, 412 F.3d 707, 714 (6th Cir. 2005) (§1983). Thus, to the extent their allegations about "historic" decisions regarding which teams to support are essential to their claim, their claims are barred.[14] The last

---

[14] Plaintiffs cannot rely on the "continuing violations doctrine," which does not apply to Title IX claims. *Dibbern v. Univ. of Mich.*, 2016 WL 2894491, at *19 (E.D. Mich. May 18, 2016) ("This Court concludes that the continuing violations doctrine does not apply and, therefore, any Title IX claims asserted … that are based upon pre-December 21, 2009 incidents are time-barred."); *Gjeka v. Delaware County Community College,* 2013 WL 2257727, *4-5 (E.D. Pa. May 23, 2013); *LRL Properties v. Portage Metro Housing Authority*, 55 F.3d 1097, 1105 n.3 (6th Cir. 1995) ("Courts have been extremely reluctant to apply this [continuing violations] doctrine outside of the context of Title VII"); *Folkes v. New York College of Osteopathic Medicine*, 214 F. Supp. 2d 273, 288-289 (E.D.N.Y. 2002) (questioning whether the continuing violation doctrine applies to Title IX

realignment of teams to occur at the University prior to the decision disputed here was in 2010, when the University eliminated two men's teams and added a women's team. Thus, pre-2015 actions (or inactions) are well outside the statute of limitations and cannot be used as a basis for liability. As relevant to this case, Plaintiffs may only challenge the University's March 2018 decision, since that is the only action alleged that occurred within the three-year limitations period. Because that singular decision impacted 58 male students and 25 female students, Plaintiffs will be unable to establish that female athletes were "excluded from participation" "on the basis of sex." 20 U.S.C. §1681(a).

### 2.   Plaintiffs Cannot Establish Irreparable Harm

Plaintiffs also fail to meet their burden to prove irreparable harm. The University announced the discontinuation of the four sports in March, precisely so that the affected student-athletes would have adequate time to secure opportunities to play their sports at other schools, if they chose to do so. Although Plaintiffs now seek emergency relief, they do not explain why they waited for three months to make the request—waiting until long after the University took affirmative steps to discontinue the sports, including giving away uniforms, voiding NLIs for prospective student-athletes, notifying the Mid-America Conference, signing severance agreements with coaches, etc. This delay "undermines [Plaintiffs']

*Continued from previous page.*
claims since the Supreme Court has been "reluctan[t] to extend the reach of Title IX beyond that imposed by Congress")).

allegation of irreparable harm." *Wells Fargo v. WhenU.com*, 293 F. Supp. 2d 734, 772–72 (E.D. Mich. 2003).  Indeed, courts routinely find that "[a] delay between the discovery of the allegedly infringing conduct and the request for injunctive relief can support an inference that the alleged harm is not sufficiently severe or irreparable to justify injunctive relief." *Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 713-14 (S.D. Ohio 2015) (internal quotation omitted).

Additionally, courts have found irreparable harm lacking where, as here, "student-athletes would not lose their scholarship funding if they chose to stay at [their university] and [where] the students were free to transfer to other colleges offering their chosen sport, which some of the students had done, so that those athletes were still able to compete at the college level."[15]  *Equity in Athletics v. Dep't of Educ.*, 291 F. App'x 517, 521 (4th Cir. 2008).  *See also Miller v. Univ. of Cincinnati,* 2007 WL 2783674, at *11 (S.D. Ohio Sept. 21, 2007) ("Plaintiffs have not proved they will suffer an irreparable injury if the University is not enjoined from terminating the program.  The University has committed itself to continuing scholarship assistance to any rower who will not be able to compete because of

---

[15] The instant case is distinguishable from other cases finding irreparable harm due to the discontinuation of an athletic team.  For example, in *Quinnipiac University*, the district court found irreparable harm in part because "[t]he decision to eliminate the team at the end of the year limits [plaintiffs'] chances of transferring."  616 F. Supp. 2d at 291.  The court also noted the unique personal circumstances that all but required the two plaintiffs to remain at Quinnipiac. *Id.* at 292.  As noted below, Plaintiffs misrepresent the transfer challenges they purportedly face.

termination of the program.  It has also agreed to 'release' under NCAA rules any rower who wishes to remain in competitive collegiate rowing to transfer to another school."); *Gonyo v. Drake Univ.,* 837 F. Supp. 989, 994 (S.D. Iowa 1993) ("Plaintiffs' desire to complete their college education and intercollegiate wrestling at Drake, the school of their choice, is understandable, but Title IX does not establish a right to participate in any particular sport in one's college.").  Indeed, as noted above, some of the affected student-athletes have already transferred and most of the prospective student-athletes intend to play for other schools. Accordingly, Plaintiffs' assertion that the March announcement "came too late to allow [incoming freshman] to find opportunities at others schools" lacks a factual basis.  (Dkt#3-1, Pl's Br at 3).  And, to the extent Plaintiffs allege they are harmed because of unspecified "Transfer Risks," those risks arose from their own inaction, which cannot be used to justify injunctive relief.

Plaintiffs also exaggerate the limits placed upon their ability to transfer.  As noted above, despite Ms. Chretien's blanket assertion that "[t]here are not many universities where I could play Division I softball and major in aviation," (Dkt#2, Chretien Dec, ¶8), it is apparent that there are numerous opportunities for her. Additionally, Ms. Mayerova's discussion of limits placed upon her because of her visa status mispresents the law.  Mayerova alleges that if she were to transfer, she would have to go through a "very intense process" regarding her immigration

status that would require her to "return to the Czech Republic and begin the process to obtain a new student visa." (Dkt#2, Mayerova Dec, ¶12). She further claims that "[i]t would not be possible to accomplish this feat" between the time of the March 20 announcement and the new school year. (*Id.*) This is not true. The Department of Homeland Security provides detailed, simple instructions for a transferring student (and receiving school) that undercut Mayerova's allegations. 8 C.F.R. §214.2(f)(8)(ii).[16]  As long as Mayerova follows the transferring instructions, there should be no problem transferring to another school while not leaving the United States. (*Id.*)  Furthermore, 8 C.F.R. §214.2(f)(8), which describes the regulations governing school transfers, specifically permits students on an F-1 visa to remain in the country if they "will begin classes at the transfer school or program within 5 months of transferring out of the current school."

Finally, Plaintiffs' assertion that the Court can "presume" irreparable harm is misplaced. This is because "if a court finds it unlikely that a plaintiff will succeed on the merits of a constitutional claim, the 'argument that [s]he is entitled to a presumption of irreparable harm based on the alleged constitutional violation is without merit,'" and "[t]he Court must look elsewhere for irreparable harm." *Doe*

---

[16] (Ex 5, Instructions for Transferring to Another School as an F-1 Student, available at https://studyinthestates.dhs.gov/instructions-for-transferring-to-another-school-as-an-f-1-student.) A series of Frequently Asked Questions is also available on the U.S. Customs and Immigration Enforcement website (https://www.ice.gov/sevis/f1-transfers.)

*v. The Ohio State Univ.*, 136 F. Supp. 3d 854, 871 (S.D. Ohio 2016) (quoting *Overstreet v. Lexington–Fayette Urban Cty. Gov't*, 305 F.3d 566, 578-79 (6th Cir. 2002). Because Plaintiffs have not shown they are likely to succeed on the merits of their claims, they are not entitled to a presumption of irreparable harm.

### 3. Granting Injunctive Relief Would Cause Substantial Harm to Others

Over 20,000 graduate and undergraduate students are enrolled at EMU.[17] The decision to reduce sports was made months ago for budgetary reasons. The reductions allow the University to realign and focus its resources on academic programs and facilities. Requiring the University to reconstitute two of the four disbanded teams (softball and women's tennis) would divert resources from educational programs, thereby harming the rest of the student body who have no connection to intercollegiate athletics. *See Equity in Athletics*, 291 F. App'x at 521 (balance of harms did not favor plaintiff where injunction sought months after announcement); *id.* at 522 ("In anticipation of the upcoming college year, coaches had already been terminated, competitions had been cancelled, and … funding had been reallocated….").

Moreover, the individual Plaintiffs' requested relief would harm the putative class, which is not limited to potential softball and tennis players. An injunction that requires the University to bring back two specific teams would necessarily

---

[17] (https://www.emich.edu/facts/index.php).

divert resources, undercutting efforts by other class members "who seek to participate in … any other sport not currently offered by EMU." (Dkt#1, Compl, Prayer For Relief, ¶A). In other words, in a class action, a remedy that requires an institution to maintain a specific sports team "goes further than necessary to correct a violation of Title IX." *See Robert*, 998 F.2d at 833.

### 4.    The Public Interest Favors Denying Plaintiffs' Request

Universities in the State of Michigan enjoy a unique constitutional status. More specifically, the Michigan Constitution provides that the governing board of institutions of higher education "shall have general supervision of the institution and the control and direction of all expenditures from the institution's funds." Const 1963, art 8, §§5, 6. These provisions grant the universities autonomy in how they manage their respective budgets. *See, e.g.*, *Regents of Univ. of Mich. v State*, 47 Mich. App. 23, 52; 208 N.W.2d 871 (1973). Thus, Michigan public policy, as enshrined in the Constitution, favors deferring to the University's budgetary decisions, particularly in the absence of Plaintiffs demonstrating that the remaining preliminary injunction factors favor injunctive relief.

In *Equity in Athletics v. Dep't of Educ.*, 504 F. Supp. 2d 88 (W.D. Va. 2007), the district court concisely explained why it is not in the public interest for courts to micromanage athletic departments as they strive towards Title IX compliance. It explained that "the final factor, the public interest, 'weighs in favor of permitting

colleges and universities to chart their own course in providing athletic opportunities without judicial interference or oversight, absent a clear showing that they are in violation of the law.'"[18] *Id*. at 112 (quoting *Gonyo v. Drake Univ*., 837 F. Supp. 989, 996 (S.D. Iowa 1993)).  Here, given the critical flaws with the merits of Plaintiffs' claims, the public interest favors denying the requested injunction.

## V.    Conclusion

For all of these reasons, Defendants request that the Court deny Plaintiffs' motion in its entirety.

Respectfully submitted,

/s/Brian M. Schwartz
Miller, Canfield, Paddock and Stone, P.L.C.
Attorneys for Defendants
150 West Jefferson, Suite 2500
Detroit, Michigan  48226
(313) 963-6420
schwartzb@millercanfield.com
P69018

---

[18] An article in *The Chronicle of Higher Education* noted that "in choosing to eliminate teams like women's tennis and men's wrestling, Eastern Michigan is swimming with the tide. Over the course of the last decade, colleges' athletics departments at all levels have dropped those and other sports in decline."  (Ex 6, Chronicle Article, *available at* https://www.chronicle.com/article/Here-Are-the-Hottest-College/242951).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 29, 2018, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

/s/Brian M. Schwartz
Miller, Canfield, Paddock and Stone, P.L.C.
Attorneys for Defendants
150 West Jefferson, Suite 2500
Detroit, Michigan  48226
(313) 963-6420
schwartzb@millercanfield.com
P69018

31617137.9\025676-00117