UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**MARIE MAYEROVA and ARIANA CHRETIEN, individually and on behalf of all those similarly situated**

          Plaintiffs,

v.

**EASTERN MICHIGAN UNIVERSITY, JAMES SMITH, SCOTT WETHERBEE, and THE BOARD OF REGENTS,**

          Defendants.

Case No. 18-cv- 11909-GCS-RSW
Hon.  George Caram Steeh
Mag.   R. Steven Whalen

**DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION**

ROBERTS & FREATMAN
*Attorneys for Plaintiffs*
Tracy E. Van den Bergh (P70066)
125 N. Huron Street
Ypsilanti, MI 48197
(734) 483-4166
Email: tracy@roberts-freatman.com

NEWKIRK ZWAGERMAN
*Attorneys for Plaintiffs*
Jill Zwagerman (AT0000324)
Beatriz Mate-Kodjo (AT0012331)
Lori Bullock (AT0012240)
521 E. Locust Street, Suite 300
Des Moines, IA 50309
Telephone: 515-883-2000
Email: jzwagerman@newkirklaw.com
Email: bmate-kodjo@newkirklaw.com
Email: lbullock@newkirklaw.com

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
Brian M. Schwartz (P69018)
Robert T. Zielinski
Megan P. Norris (P39318)
Jacob Hogg (P81275)
*Attorneys for Defendants*
150 West Jefferson, Suite 2500
Detroit, Michigan  48226
(313) 963-6420
schwartzb@millercanfield.com

## I.    Introduction

The "expert" opinion of Nancy Hogshead-Makar submitted by Plaintiffs at the close of the hearing (Plaintiffs' Ex 120 or "Report") does not provide any basis for a finding that Eastern Michigan University ("EMU" or the "University") engaged in intentional discrimination that would support a private right of action under Title IX.[1]    There are two fundamental flaws with Hogshead-Maker's analysis.

**First**, Hogshead-Makar equates a "lack of compliance" with the OCR Policy Interpretation with intentional discrimination.  The two are different animals, and only the latter may be the subject of a private right of action.  This error is compounded by Hogshead-Makar reflexively equating any statistical disparity between the proportion of women students at EMU and the proportion of women student-athletes with intentional discrimination.  Hogshead-Makar's theories, however, are barred by the explicit language of Title IX.

**Second**, even if the OCR Policy Interpretation is the relevant measure of compliance, and lack of compliance can be the subject of a private right of action,

---

[1]  Plaintiffs did not attach Ms. Hogshead-Makar's report to their Reply brief.  It was produced prior to the July 17, 2018 hearing, after Defendants had filed their *Motion to Exclude Expert Testimony* (Dkt#30).  At the July 17 hearing, the Court invited Defendants to respond to the report.  (Transcript at 73-74).  The transcript of the hearing is attached to Defendants' *Post-Hearing Proposed Findings of Fact and Conclusions of Law*, which is being filed contemporaneously with this brief.

the Report misapplies the law and the facts to suggest that EMU is out of compliance with the Policy Interpretation when the evidence shows otherwise.

Overall, the Court should reject any attempt by Plaintiffs to rely on Ms. Hogshead-Makar's legal brief masquerading as expert report.

## II.     Argument

### A.     Hogshead-Makar's Analysis is Based on Erroneous Legal Assumptions

Permeating Hogshead-Makar's analysis, and Plaintiffs' case in general, is an assumption that any "noncompliance" with the OCR Policy Interpretation is sufficient to state a private right of action.  However, private rights of action under Title IX are limited to claims of intentional discrimination, and not every failure to comply with a regulation or guidance constitutes intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 285-89 (2001).  As described by Hogshead-Makar, the Policy Interpretation requires not merely the avoidance of intentional discrimination, which may be the subject of a private right of action, but also affirmative acts to promote and encourage women to become interested in sports to a level sufficient to support statistical parity.  (*See, e.g.,* Plaintiffs' Exhibit 120, Report at p. 10 "Thus, [the policy guidance] requires that institutions make joint efforts to encourage interest and to create competition.")  But, failing to take affirmative action is not a form of intentional discrimination.  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258-59 (1981).  The situation here is

comparable to the difference between Title VII, which bans intentional discrimination in employment for which there is a private right of action, and the affirmative action requirements of Executive Order 11246[2] under which no private right of action is allowed. *Stefanovic v. Univ. of Tennessee*, 935 F. Supp. 944, 948 (E.D. Tenn. 1996) ("Executive Order 11246 does not create a private right of action for persons alleging employment discrimination."). Even Hogshead-Makar admits that the Policy Interpretation, like Executive Order 11246, is in part aspirational by seeking to engage recipients of federal funding in efforts to affirmatively create more interest in women's athletics than had historically been the case. (Ex. 120 at pp. 2 and 8).

Plaintiffs' and Hogshead-Makar's attempt to equate any non-compliance with the Policy Interpretation with a finding of intentional discrimination is further undermined by their implicit assumption that any statistical disparity between the proportion of women who are student-athletes and the proportion of women who are students constitutes intentional discrimination. (*See, e.g.,* Plaintiffs' Exhibit 120, Report at 3 (making the legal conclusion, based solely on relative numbers of male and female athletes, that "EMU is currently discriminating against its female

---

[2] Executive Order 11246 requires government contractors to "take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin."

students.…").   Hogshead-Makar's assumption is wholly inconsistent with the express provisions of Title IX.

Section 901 of Title IX first provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."   20 U.S.C. §1681(a).   The very next subsection expressly prohibits any finding of a violation based on mere statistical disparity:

> Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or  percentage of persons of that sex in any community, state, section or other area.…

20 U.S.C. §1681(b).  Equating statistical imbalance with intentional discrimination is a flaw that undermines the entirety of Plaintiffs' case and Hogshead-Makar's Report.  *See also Roberts v. Colorado State Bd. of Agriculture*, 998 F.2d 824. 831 (10th Cir. 1993) ("a Title IX violation may not be predicated solely on a disparity between the gender composition of an institution's athletic program and the gender composition of its undergraduate enrollment").

**B.      Hogshead-Makar's Analysis Ignores Critical Facts**

Even assuming that failure to comply with the OCR Policy Interpretation can be considered intentional discrimination for which a private right of action is allowed, Hogshead-Makar (and consequently Plaintiffs) ignore critical facts. Specifically, focusing solely on snapshots of raw numbers, they fail to take into account EMU's past, present, and ongoing efforts to expand women's participation opportunities. Their failure to consider these facts significantly undermines their likelihood of success on the merits and thus their request for mandatory injunctive relief.

Plaintiffs concede that a university's ongoing efforts to expand women's athletic participation satisfies the three part test, but ignore the evidence of ongoing expansion of women's opportunities that was presented. The raw numbers demonstrate the effects of EMU's ongoing effort to expand women's participation opportunities. The March 2018 budget reductions were implemented in a manner designed to facilitate that ongoing expansion. The charts of male and female athletic participation attached to Plaintiff's Reply Brief, and contained in Hogshead-Makar's Report, demonstrate a trend line of growing women's athletic

participation. (Dkt#17-1, Exhibit D – "Unduplicated", PageID.329 and Dkt#71-2, Exhibit E – "Duplicated", PageID.330).[3]

For example, Plaintiffs' Reply Exhibit E is a chart showing the number of duplicated women's participation opportunities from 2003 through 2016. While there is expected annual fluctuation within those numbers, the average rate of participation has clearly been increasing. The five-year average of the "Count Women's Participation" from 2007-2011 was 222.6 female participants. For the most recent five years on the chart, 2012-2016, the average numbers of female participants increased to 313.4. In short, EMU increased women's average annual participation by 90 participation opportunities.[4] Thus the trend line reflects a 40% (90/223) growth rate in women's participation. As Vice President and Director of Athletics Scott Wetherbee testified, this growth was not the result of mere happenstance, but instead due to a five-year roster management plan that was in place before he arrived at EMU in 2017.

Wetherbee testified that it is EMU's intention to further expand women's opportunities and manage its rosters to progressively bring the athletic participation rates into proportionality with the ratio of men and women in the

---

[3] These charts were first submitted by Plaintiffs with their Reply Brief and were not submitted with their initial Motion or their Complaint.

[4] The same is true of the "unduplicated" counts reflected on Plaintiffs' Exhibit D. (Dkt#17-1, Exhibit D, PageID.329). From 2012-16, EMU had an average of 261.8 women participants, compared with an average of 212.6 between 2007-11.

student body.  Attached to Wetherbee's Declaration is additional information requested by the Court. (Ex 1, Wetherbee Declaration).  These documents demonstrate the increased participation in recent years, as well as projected participation rates through the 2022-23 academic year.  As reflected in the charts, there has been continuing growth in women's participation both in absolute numbers as well as a percentage of overall opportunities.[5]  Additionally, Wetherbee testified that the University's existing plans are likely to lead to more women's participation, constituting 58.81% (duplicated) or 59.93% (unduplicated) of athletic participation by 2023.  The documents produced with his Declaration project the number of women's participation opportunities to grow to 397 (with lacrosse), or 83 higher than the most recent five-year average discussed above (2012-16), or 174 more than the prior five-year average (2007-11).  (Ex 1, Wetherbee Declaration, ¶¶8-9).

Wetherbee explained that the two women's sports discontinued had a cost per participant that was well in excess of other male and female sports.  As a result, their discontinuance would allow greater expansion of women's opportunities in other women's sports, such as crew, because those sports had much lower per participant costs.  (Ex 1, Wetherbee Dec, ¶¶10-11 and Exhibit C).

---

[5] Adding the actual duplicated numbers for 2016 and 2017 as well as the likely roster numbers for the upcoming year, increases the rolling five-year average for the period 2015-19 to 316.

Wetherbee further explained that he made the difficult budget decisions with a view to how those decisions would affect the ongoing, long-term plan to expand women's participation.   He stated why four sports (football, men's basketball, women's basketball and women's volleyball) could not be eliminated without incurring massive financial penalties that would have threatened the existence of the entire sports program.  (Transcript (Wetherbee) at 82-84).  He further explained that the required budget reductions could not have been accomplished by eliminating solely men's sports, and that by selecting women's softball and tennis, he sought to affect the smallest number of women student-athletes possible, while still achieving the required budget targets.  (Transcript (Wetherbee) at 80-85, 92).

Wetherbee's goal of minimizing the impact is supported by the numbers and methodology used by Plaintiffs.  The sports selected for discontinuance had, at the time of the decisions, a total of 58 male student-athletes and 23 female student-athletes.  Hogshead-Makar states that there were 314 male and 242 female athletes (unduplicated) prior to the cuts.    (Plaintiffs' Ex 120 at 5).   Thus, 18.47% of existing male student-athletes (58/314=18.47) but only 9.5% of existing female student-athletes (23/242=9.5) were adversely affected by the cuts.   Thus, male student-athletes were adversely affected at double the rate at which female athletes were affected.  Applying Plaintiffs' methodology for calculating the "participation

gap," the effect of the cuts was to reduce the gap from 224 to 163.  A recalculation of the gap, using Plaintiffs' methodology is shown on Exhibit 2, attached hereto.)[6]

Plaintiffs, through Hogshead-Maker, opine that the absence of any intentional animus against women student-athletes is irrelevant because within the context of the trend of growing women's participation rates, there were occasional one-year negative fluctuations.  (Plaintiffs' Ex 120 at p. 9).  Hogshead-Makar asserts that "if participation for the underrepresented sex declines at any point during the 1975 through 2010 period … a Prong Two defense cannot be used … To be clear, EMU has lost this legal test forever; and it lost it before it cut women's softball and tennis."  (*Id.*)

Neither Hogshead-Makar nor Plaintiffs provide any citation to this extravagant claim about the state of the law.  Nor do they consider the host of irreconcilable issues it would raise.  For example, given that the statute of limitations for private rights of action under Title IX is three years, how can something done anytime between 1975 and 2010 become the basis of a suit in 2018?  Nor do they explain why short term fluctuations, which can be caused by any number of factors unrelated to gender, should be automatically attributed to intentional sexual discrimination by the institution.

---

[6] The recalculation shown on Exhibit 2 uses Plaintiffs' statement that after the cuts there were 256 total male student-athletes and 217 total female student-athletes. (Plaintiffs' Ex 120 at p. 16).

Hogshead-Makar's interpretation of Prong Two is also contradicted by OCR.  In a clarification of the Three-Part Test, OCR explains that the second part of the Three Part Test ("Prong Two") considers "whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex." (https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html)  "There are no fixed intervals of time within which an institution must have added participation opportunities. Neither is a particular number of sports dispositive." (*Id.*)   Among the factors that OCR considers under the second part is "an institution's record of ***increasing the numbers of participants*** in intercollegiate athletics who are members of the underrepresented sex." (*Id.* (emphasis added)).   Furthermore, eliminating a sports team for the underrepresented sex (here, women), does not prevent a university from relying on the second part test.   Instead, OCR's clarification states, "In the event that an institution eliminated any team for the underrepresented sex, OCR would evaluate the circumstances surrounding this action in assessing whether the institution could satisfy part two of the test." (*Id.*) Thus, "an institution that has eliminated some participation opportunities for the underrepresented sex can still meet part two if, overall, it can show a history and continuing practice of program expansion for that sex." (*Id.*)   Accordingly,

Hogshead-Makar's report shows a complete disregard for OCR's interpretation of its own regulations.

Plaintiffs do not dispute the gender-neutral financial reasons that required a reduction in athletic spending. Likewise, they do not challenge the fact that the cuts fell more harshly on male student-athletes rather than female student-athletes. And, they ignore that the overall trend of female participation has been clearly positive despite some occasional bumps in the road, such as EMU's current budgetary constraints. Instead, misconstruing both the law and the evidence, and using a cookie-cutter approach eschewed by OCR, they suggest that EMU is automatically liable regardless of anything it did (and regardless of intent) because the numbers of female student-athletes are not proportionate to its number of female students. (Plaintiffs' Ex 120 at 16 ("if EMU were to keep the female sports programs while still dropping the male programs the numbers will reach 256 males and 242 females respectively. This number still falls short of the number required for Title IX compliance.")). A legal theory stating that even if EMU had exclusively eliminated male sports in spring 2018, it would still have committed intentional discrimination against women, is not grounded in reality.

### III.   Conclusion

For the foregoing reasons, in the event the Court does not grant Defendant's *Motion to Exclude Expert Testimony* (Dkt#30), the Court should reject Ms. Hogshead-Makar's legal analysis.

Respectfully submitted,

/s/Brian M. Schwartz
Miller, Canfield, Paddock and Stone, P.L.C.
Attorneys for Defendants
150 West Jefferson, Suite 2500
Detroit, Michigan  48226
(313) 963-6420
schwartzb@millercanfield.com
P69018

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2018, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

/s/Brian M. Schwartz
Miller, Canfield, Paddock and Stone, P.L.C.
Attorneys for Defendants
150 West Jefferson, Suite 2500
Detroit, Michigan  48226
(313) 963-6420
schwartzb@millercanfield.com
P69018

31817587.3\025676-00117