UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARIE MAYEROVA and
ARIANA CHRETIEN,

        Plaintiffs,

                                  Case No.  18-11909
vs.                               HON.  GEORGE CARAM STEEH

EASTERN MICHIGAN UNIVERSITY,
JAMES SMITH, SCOTT WETHERBEE,
and THE BOARD OF REGENTS,

        Defendants.
_____/

**OPINION AND ORDER GRANTING PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION (DOC. 3)**

       Plaintiffs Marie Mayerova and Ariana Chretien allege that defendants

Eastern Michigan University, EMU President James Smith, EMU Athletic

Director Scott Wetherbee, and the EMU Board of Regents violated Title IX

and the Equal Protection Clause by failing to provide sufficient

opportunities for women to participate in athletics. This lawsuit was filed

following EMU's decision to eliminate four teams; men's wrestling, men's

swimming and diving, women's tennis, and women's softball.  Plaintiffs

seek to represent a class of every impacted woman student-athlete, recruit,

and future recruit/student-athlete. Count I of the complaint alleges a

- 1 -

violation of Title IX. Count II, brought pursuant to 42 U.S.C. § 1983, alleges a violation of the Equal Protection Clause of the Fourteenth Amendment.

Plaintiffs filed a motion for temporary restraining order/preliminary injunction on June 15, 2018. (Doc. 3). Defendants filed a response on June 29, 2018. (Doc. 13). Plaintiffs replied on July 9, 2018. (Doc. 17). Both parties filed hearing briefs. (Doc. 23 and 25). The court held oral argument and heard testimony on July 17, 2018. The court took the matter under advisement and ordered supplemental briefing. Each party filed a post-hearing brief on July 31, 2018, (Doc. 43, 35 and 36), and August 7, 2018, (Doc. 37 and 38). For the reasons stated below, Plaintiffs' motion is GRANTED.

## BACKGROUND FACTS

### A. The Student-Athlete Plaintiffs

Marie Mayerova is a senior at EMU who joined the women's tennis team her freshman year and played until EMU terminated the team. A native of the Czech Republic, Mayerova was recruited by EMU and received a full athletic scholarship. Mayerova contends that her student visa restricts her to attending EMU and that "she does not have the resources to effectively transfer." Doc. 3-1 at 5. According to Mayerova, a

transfer would require her to return to the Czech Republic in order to re-apply for a new student visa.

Ariana Chretien is a junior at EMU who was recruited for the women's softball team, which she joined her freshman year. Chretien receives a partial scholarship and is studying aviation, a less common major. After EMU disbanded the softball team, Chretien received interest from other schools, but testified that they either did not offer her major or did not have scholarships available. Hearing Tr. at 64.

### B. Athletic Opportunities at Eastern Michigan University

Approximately 12,700 undergraduates attend EMU, which is a member of the Mid-American Conference. Defendants assert that 59.5% of undergraduates for the 2017-2018 school year were women, and 40.5% were men. At that time, EMU had 729 undergraduate student-athletes participating in varsity athletics on twenty-one teams. Four hundred and six men, or 55.7% of EMU student-athletes, participated on nine teams: baseball, basketball, cross country, football, golf, swimming and diving, track and field (indoor and outdoor), and wrestling. (Doc. 13-3 at PageID 178). Three hundred twenty-three women, or 44.3% of EMU student-athletes, participated on twelve teams: basketball, cross country, golf,

gymnastics, rowing, soccer, softball, swimming and diving, tennis, track and field (indoor and outdoor), and volleyball. *Id.*

EMU has operated with a budget deficit for the last seven years. The university attributes its financial struggles to declining state support and shifts in population and enrollment. Because EMU's athletic department is not self-sufficient, the university's financial problems have impacted athletic funding. In March 2018, EMU decided to reduce athletic spending by $2 million by eliminating four teams: men's wrestling, men's swimming and diving, women's tennis, and women's softball. (Doc. 34 at PageID 1002, 1004). Eighty-three student-athletes participated on these teams during the 2017-2018 school year – fifty-eight men and twenty-five women. (Doc. 13-3 at PageID 177).

In making the decision to eliminate teams, EMU sought to retain NCAA Division 1 standing and remain in the Mid-American Conference. This required maintaining sixteen sports, including football, men's and women's basketball, and volleyball, as well as at least six male sports. EMU avers that remaining in the Mid-American Conference "adds value to EMU degrees and provides a financial benefit to the University," which would incur substantial costs if it were to exit the conference. (Doc. 34 at 2.) EMU also considered the costs associated with each sport, including

the cost per athlete. Although EMU tried "to be as least impactful . . . as possible" to female athletic participation, it claims that it could not achieve its budgetary goals by eliminating men's teams alone. Tr. at 84-85, 92.

EMU announced the teams' elimination on March 20, 2018. Student-athletes could choose to transfer without sacrificing any period of their NCAA eligibility or remain at EMU and continue to receive their athletic and academic scholarship aid. (Doc. 13-3 at PageID 180).

At that time, the softball team had seventeen members. (Doc. 13-3 at PageID 178). Four members exhausted their NCAA eligibility after the spring 2018 season and at least one is transferring. *Id.* Five, including plaintiff Chretien, indicated an intent to return to EMU. *Id.*

The tennis team had eight members in the spring of 2018, five of whom have exhausted their NCAA eligibility. (Doc. 13-3 at PageID 178). Two members, including plaintiff Mayerova, indicated an intent to return to EMU. *Id.*

All incoming student-athletes who had signed National Letters of Intent (NLI) with EMU for 2018-2019 were also notified of EMU's decision on March 20, 2018. (Doc. 13-3 at PageID 177-78). They were apprised of the same options of transferring or attending EMU with their scholarships. *Id.* At least five of the seven prospective women's softball players signed

an NLI or committed to another school. *Id.* At least two of the three prospective women's tennis players signed an NLI or committed to another school. *Id.*

Defendants claim there are currently not enough student-athletes to field a viable women's softball team, which typically has at least seventeen members, or a viable women's tennis team, which typically has eight to twelve members. In response, plaintiffs rely on the testimony of Chretien and former tennis coach Jason Wiseman, who claim that both sports could field teams with returning players and walk-on athletes. Chretien testified that eleven softball players, including pitchers and catchers, remain on campus, which would allow EMU to field a team. Tr. at 67. The softball season generally includes nonconference games in the fall, and conference games in the spring. *Id.* at 71.

Since March, EMU has taken actions to wind down the teams. Every full-time coach involved in the four eliminated teams was terminated and signed a severance agreement. The university cancelled apparel and uniform orders and gave away existing inventory, predominately to members of the 2017-2018 teams. *Id.* The Mid-American Conference scheduled competitions for 2018-2019 school year without the four terminated EMU teams. Defendants assert that the passage of time

increases the difficulty of compiling a competition schedule for the eliminated teams. Plaintiffs rely upon Wiseman, who claims that a schedule could be created before the competitive season begins. (Doc. 34-2 at PageID 1099-1100).

## LAW AND ANALYSIS

Plaintiffs contend that the elimination of the women's tennis and softball teams violates Title IX and the Equal Protection Clause. Relying upon their Title IX claim at this stage, Plaintiffs seek an injunction requiring EMU to reinstate the teams.

### A. Legal Framework under Title IX

"Enacted in response to evidence of 'massive, persistent patterns of discrimination against women in the academic world,'" Title IX prohibits gender discrimination by educational institutions that receive federal funding. *Equity in Athletics, Inc. v. Dept. of Educ.,* 504 F. Supp. 2d 88, 94 (W.D. Va. 2007) (*Equity in Athletics I*), *aff'd* 291 Fed. Appx. 517 (4th Cir. 2008) (*Equity in Athletics II*) (citation omitted). Section 901 of the statute provides,

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . .

20 U.S.C. § 1681(a).  EMU is a public university that receives federal funding and is therefore subject to Title IX.

Under § 902 of the statute, the Department of Education is authorized to issue regulations effectuating the provisions of Title IX. 20 U.S.C. § 1682. *See Equity in Athletics I*, 504 F. Supp.2d at 95-98 (detailing history of Title IX and accompanying regulations).  Title IX regulations regarding athletics provide that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a). The regulations further provide that "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). The regulations instruct that equal opportunity is defined by several factors, including:

> 1. Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
> 2. The provision of equipment and supplies;
> 3. Scheduling of games and practice time;
> 4. Travel and per diem allowance;
> 5. Opportunity to receive coaching and academic tutoring;

> 6. Assignment and compensation of coaches and tutors;
> 7. Provision of locker rooms, practice and competitive facilities;
> 8. Provision of medical and training facilities and services;
> 9. Provision of housing and dining facilities and services;
> 10. Publicity.

34 C.F.R. § 106.41(c).  Plaintiffs' claim seeks effective accommodation – the equal opportunity to participate in athletics -- pursuant to § 106.41(c)(1).

In 1979, the administering agency issued a Policy Interpretation to "clarif[y] the obligations which recipients of Federal aid have under Title IX to provide equal opportunities in athletic programs. In particular, the Policy Interpretation provides a means to assess an institution's compliance with equal opportunity requirements of the regulation which are set forth at [34 C.F.R. §§ 106.37(c) and 106.41(c) ]." *Cohen v. Brown Univ.,* 809 F. Supp. 978, 983 (D. R.I.1992) (citing 44 Fed. Reg. at 71415 (Dec. 11, 1979)) (*Cohen I*).

The Policy Interpretation includes a three-part test to determine compliance in the area of accommodation:

> 1. Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to the respective enrollments; or

2. Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

3. Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as cited above, whether it can be demonstrated that the interests and abilities of the members of the sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. 71413, 71418 (Dec. 11, 1979) ("Three-Part Test").  Since the issuance of the Policy Interpretation, the Department of Education has provided further clarification that educational institutions need to comply only with one part of the Three-Part Test to provide nondiscriminatory athletic opportunities. Office of Civil Rights, U.S. Department of Education, *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 15, 1996) ("1996 Clarification").

The court accords the agency's interpretation of Title IX deference under *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984).  "The degree of deference is particularly high in Title IX cases because Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX." *Cohen v. Brown*

*University*, 991 F.2d 888, 895 (1st Cir. 1993) (*Cohen II*).  *See also Miami Univ. Wrestling Club v. Miami Univ.,* 302 F.3d 608, 615 (6th Cir. 2002) (according deference to 1979 Policy Interpretation).

### B. Private Right of Action

As a threshold matter, Defendants contend that Plaintiffs do not have a private right of action to enforce Title IX regulations, pursuant to *Alexander v. Sandoval*, 532 U.S. 275 (2001).  In *Sandoval*, the Supreme Court considered whether there was a private right of action to enforce disparate impact regulations promulgated under Title VI of the Civil Rights Act of 1964, which prohibits recipients of federal funds from discriminating on the basis of race, ethnicity, or national origin.  *Id.*; 42 U.S.C. § 2000d *et seq.*  Although *Sandoval* interprets Title VI, it is relevant here because Title IX was patterned after Title VI and courts interpret these statutes consistent with each other.  *See Cannon v. University of Chicago*, 441 U.S. 677, 694-95 (1979) (noting congressional intent to interpret Title IX consistent with Title VI and finding a private right of action to enforce Title IX).

In *Sandoval*, the plaintiffs challenged the Alabama Department of Public Safety's decision to administer state driver's license examinations only in English.  The plaintiffs argued that the decision violated Title VI because it had the effect of discriminating against non-English speakers

based upon their national origin.  The plaintiffs sought to enforce a

regulation promulgated pursuant to § 602 of Title VI, which forbid federal

funding recipients to "utilize criteria or methods of administration which

have the *effect* of subjecting individuals to discrimination because of their

race, color, or national origin. . . ." *Sandoval*, 532 U.S. at 278 (emphasis

added).  By its terms, the regulation prohibits activities that create a

disparate impact on the basis of race, color, or national origin. *Id.* at 281-

82.

The Supreme Court noted that section § 601 of Title VI forbids only

intentional discrimination.  *Id.* at 280.  Assuming that the disparate impact

regulations were valid, the Court held that there was no private right of

action to enforce them because they "do not simply apply § 601 – since

they indeed forbid conduct that § 601 permits – and [it is] therefore clear

that the private right of action to enforce § 601 does not include a private

right to enforce these regulations." *Sandoval*, 532 U.S. at 285.  The Court

emphasized that claims seeking to enforce disparate treatment regulations

were valid:  "We do not doubt that regulations applying § 601's ban on

intentional discrimination are covered by the cause of action to enforce that

section.  Such regulations, if valid and reasonable, authoritatively construe

the statute itself, and it is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute." *Id.* at 284.

Defendants contend that Plaintiffs do not have a private right of action because they "seek relief under the OCR Policy Interpretation" which "goes beyond § 901's prohibition against intentional discrimination." Doc. 13 at 16. Defendants incorrectly characterize the Policy Interpretation and Plaintiffs' claim. The Policy Interpretation provides a means to assess an institution's compliance in providing equal opportunities in athletics; it interprets regulations prohibiting discrimination and requiring equal opportunities. *See* 34 C.F.R. § 106.41(a) and (c). Neither the regulations nor the interpretive guidance relied upon by Plaintiffs create a disparate impact standard. *See Barrett v. West Chester Univ. of Pa.*, 2003 WL 22803477 at *13 (E.D. Pa. Nov. 12, 2003) ("The regulation at issue, section 106.41, and its relevant policy interpretations clearly aim to enforce § 901's ban on intentional sex discrimination by demanding equal opportunity in athletics."); *Equity in Athletics v. Dept. of Educ.*, 639 F.3d 91, 101-103 (4th Cir. 2011) (*Equity in Athletics IV*) (rejecting arguments that the Three-Part Test exceeds the bounds of the statute or constitutes a disparate impact standard).

Moreover, Plaintiffs are not complaining about an ostensibly gender-neutral decision that happened to disparately impact women. Rather, they challenge the elimination of the women's tennis and softball teams, which is a claim of intentional discrimination. As the Ninth Circuit has explained:

> [A]thletic teams are gender segregated, and universities must decide beforehand how many athletic opportunities they will allocate to each sex. As a result, determining whether discrimination exists in athletic programs *requires* gender-conscious, group-wide comparisons. Because men are not 'qualified' for women's teams (and vice versa) athletics require a gender conscious allocation of opportunities in the first instance.

*Neal v. Board of Trustees of the Cal. State Univs.*, 198 F.3d 763, 772 n.8 (9th Cir. 1999) (emphasis in original). *See also Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 97-98 (2d Cir. 2012) ("A school's decision to provide students with athletic participation opportunities through separate sports programs for each sex thus necessarily raises a disparate treatment rather than disparate impact claim in that the school decides which athletic opportunities are available to particular students 'on the basis of sex.'"); *Barrett*, 2003 WL 22803477 at *12 (university's decision "to eliminate the *women's* gymnastics team was an intentional act based on gender").

*Sandoval* is not implicated here because Plaintiffs are not attempting to enforce disparate impact regulations; rather, their claim "is intentional

sex discrimination under § 1681(a) [§ 901 of Title IX] for which . . . there is a private cause of action; the regulations merely provide guidance in interpreting § 1681." *Parker v. Franklin Cty. Comm. Sch. Corp.*, 667 F.3d 910, 919-20 (7th Cir. 2012). *See also Sandoval*, 532 U.S. at 284 ("We do not doubt that regulations applying § 601's ban on intentional discrimination are covered by the cause of action to enforce that section."). Indeed, Defendants' argument has been rejected by the courts that have considered it. *See Barrett,* 2003 WL 22803477 at * 10-13 (holding *Sandoval* does not preclude private right of action because elimination of women's gymnastics team calls "for an analysis based upon intent, not disparate impact"); *Parker*, 667 F.3d at 919-20 (scheduling of more boys' basketball games than girls' basketball games on primetime nights stated a disparate treatment, not disparate impact, claim); *Biediger*, 691 F.3d at 97-98 (elimination of women's volleyball team stated disparate treatment, not disparate impact, claim); *Equity in Athletics, Inc. v. Dept. of Educ.*, 675 F. Supp.2d 660, 681-82 (W.D. Va. 2009) (*Equity in Athletics III*) (concluding "the regulation and the Policy Interpretation 'implement but [do] not expand the scope of Title IX,' and thus, that 'there is no *Sandoval* issue here.'"), *aff'd* 639 F.3d 91, 103 (4th Cir. 2011) (*Equity in Athletics IV*), *cert. denied* 565 U.S. 1111 (2012).

Moreover, the fact that Defendants have also eliminated men's teams does not negate a potential finding of intentional discrimination. *Barrett*, 2003 WL 22803477 at *11-12. *See also Cohen II*, 991 F.2d at 905-906 (university's claim that it "has done no more than slash women's and men's athletics by approximately the same degree. . . overlooks the shortcomings that plagued its program before it took blade in hand.").

Consistent with the above legal authority, the court finds that the implementing regulations and policy guidance effectuate, rather than expand upon, Title IX's ban on intentional discrimination. Accordingly, Plaintiffs have a private right of action to enforce their claim of intentional discrimination based upon the elimination of the women's softball and tennis teams. *Sandoval* does not mandate otherwise.

## C. Preliminary Injunction Standard

The court analyzes four factors when considering a motion for preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998). These

"four considerations . . . are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

### D. Likelihood of Success on the Merits

Plaintiffs allege that EMU is not effectively accommodating the athletic interests and abilities of female students as required by Title IX. The court applies the Three-Part Test promulgated in OCR's 1979 Policy Interpretation to assess Plaintiffs' claim. It is Plaintiffs' burden to demonstrate that "the underrepresented gender has not been 'fully and effectively accommodated by the present program'" at EMU. *Cohen II*, 991 F. 2d at 901-902. In other words, Plaintiffs must show that the number of female athletes is not proportional to the number of female students and that there is "unmet interest" in athletics. *Id.*

> If the plaintiff carries the devoir of persuasion on these two elements, she has proven her case unless the university shows, as an affirmative defense, 'a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of [female athletes].'

*Id.* at 902.

### 1. Part One – Substantial Proportionality

In assessing whether the first part of the Three-Part Test is satisfied, the court must determine whether EMU provides intercollegiate level participation opportunities for male and female students in numbers substantially proportionate to the respective enrollments. This analysis "begins with a determination of the number of participation opportunities afforded to male and female athletes in the intercollegiate athletic program." *Biediger*, 691 F.3d at 93 (quoting 1996 Clarification at 2-3). "[A]n athlete who participates in more than one sport will be counted as a participant in each sport in which he or she participates." *Id.* The court then considers whether "the numbers are substantially proportionate to each sex's enrollment." *Id.* at 94.

For the 2017-2018 school year, women comprised 59.5% of EMU's undergraduate enrollment and 44.3% of its athletes. Of 729 athletes, 406 or 55.7% were male, and 323 or 44.3% were female. Given this clear disparity, EMU does not claim to provide "substantially proportionate" athletic opportunities to its female student-athletes. *See, e.g., Cohen I*, 809 F. Supp. at 991 (university failed substantial proportionality prong when women were 48.2% of undergraduates but only 36.6% of athletes); *Favia v. Indiana Univ. of Pa.*, 812 F. Supp. 578, 584-85 (W.D. Pa. 1993) (no

substantial proportionality when 55.61% of students and 37.77% of athletes were women).  EMU correctly notes that a failure to achieve substantial proportionality does not, in itself, constitute a Title IX violation.  *See Roberts v. Colorado State Bd. of Agriculture*, 998 F.2d 824, 831 (10th Cir. 1993).  Rather, EMU finds a "safe harbor" if it satisfies the second or third parts of the Three-Part Test.

### 2. Part Two – History of Program Expansion

EMU satisfies part two of the test if it "can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities" of female athletes. Factors that may indicate a history of program expansion include:

- an institution's record of adding intercollegiate teams, or upgrading teams to intercollegiate status, for the underrepresented sex;
- an institution's record of increasing the numbers of participants in intercollegiate athletics who are members of the underrepresented sex; and
- an institution's affirmative responses to requests by students or others for addition or elevation of sports.

1996 Clarification at 3-4.  Factors that may indicate a continuing practice of program expansion include:

- an institution's current implementation of a nondiscriminatory policy or procedure for

> requesting the addition of sports (including the elevation of club or intramural teams) and the effective communication of the policy or procedure to students; and
>
> - an institution's current implementation of a plan of program expansion that is responsive to developing interests and abilities.

*Id.*

Defendants argue that EMU has a history of program expansion because the overall trend of female participation has grown between 2003 and 2018. Defendants support their argument with references to Plaintiffs' exhibit regarding historical participation gaps at EMU, (Doc. 17-2), and EMU's roster management plans, (Doc. 35-2 at PageID 1215-1223). The court examines each in turn.

The court initially considers EMU's 2014 roster management plan for 2015-20. *See* Doc. 35-2. The plan consists of spreadsheets providing – for each sport -- the number of male and female EMU student-athletes for the 2013-2014 school year, the NCAA average for number of athletes per team, and a yearly numerical target. The overall goal was to reduce the rosters for men's sports by 75 athletes and increase the rosters for women's sports by 40 athletes by 2020, increasing the participation rate for women to 50.4 percent. The bulk of the increases (28 spots) were to be in cross country (8), indoor track (9), and outdoor track (11). The roster

management plan also called for an expansion of opportunities in softball (5) and tennis (2), which were eliminated in 2018.

Defendants' 2014 roster management plan is of limited utility in assessing EMU's history of program expansion. Although the plan evidences EMU's recent intent to expand opportunities for women and increase the athletic participation rate, EMU has not provided information demonstrating that the goals outlined in the plan were met. Further, the roster plans appear to differ from the actual number of student athletes. For example, EMU asserts that there were 406 male and 323 female student-athletes in 2017-2018. The roster plan's target numbers for the same year are 345 men and 294 women. Because they lack concrete numbers and context, the roster plans do not assist the court in finding a history of program expansion.

Next, the court reviews actual numbers of EMU female athletes over the past several years. Pursuant to the Equity in Athletics Disclosure Act, EMU has certified enrollment numbers and student athlete participation data, by gender, to the U.S. Department of Education since 2003. 34 C.F.R. § 668.41(g)(1)(i). This data is summarized below:

| EADA Survey Year | Female Undergrad | Total Undergrad | % Female Undergrad | Duplicated Count Women's [Athletic] Participation | Total Duplicated [Number of Student-Athletes] | % Female Athletes (actual) |
|---|---|---|---|---|---|---|
| 2003 | 8365 | 13818 | 60.54% | 246 | 506 | 48.62% |
| 2004 | 7948 | 13215 | 60.14% | 298 | 683 | 43.63% |
| 2005 | 7889 | 13167 | 59.91% | 247 | 630 | 39.21% |
| 2006 | 7310 | 12405 | 58.93% | 250 | 626 | 39.94% |
| 2007 | 7219 | 12455 | 57.96% | 196 | 463 | 42.33% |
| 2008 | 7045 | 12234 | 57.59% | 195 | 497 | 39.24% |
| 2009 | 7218 | 12762 | 56.56% | 222 | 525 | 42.29% |
| 2010 | 7269 | 12988 | 55.97% | 240 | 554 | 43.32% |
| 2011 | 7295 | 12774 | 57.11% | 260 | 617 | 42.14% |
| 2012 | 7524 | 13092 | 57.47% | 316 | 757 | 41.74% |
| 2013 | 7727 | 13372 | 57.78% | 313 | 745 | 42.01% |
| 2014 | 7650 | 12938 | 59.13% | 311 | 722 | 43.07% |
| 2015 | 7682 | 12894 | 59.58% | 322 | 760 | 42.37% |
| 2016 | 7595 | 12714 | 59.74% | 305 | 695 | 43.88% |

(Doc. 17-2 at PageID 330). For the 2017-18 school year, there were 323 female athletes. EMU did not provide data for any time prior to 2003.

Defendants claim that EMU is expanding opportunities because EMU had an average of 222.6 female student-athletes between 2007 and 2011 and an average of 313.4 between 2012 and 2016. Defendants do not articulate why they have created a seemingly arbitrary comparison of two groups of five-year averages. Defendants claim these figures show that "EMU increased women's participation by an average of 90 student-athletes per year." (Doc. 34 at 10). Defendants' assertion is belied by a review of their own statistics, which show that EMU never added 90 female athletes in a single year, let alone an average of 90.

According to the above chart, the number of female athletes increased from 246 in 2003 to 298 in 2004, then dropped for several years to a low of 195 in 2008. The number of female athletes increased again from 222 in 2009 to 316 in 2012, remaining relatively close to that figure until reaching 323 in 2017. EMU expects the number of female athletes to be 306 in the coming school year.

The court notes that increases in the number of female athletes at EMU have generally been accompanied by increases in the number of male athletes, resulting in little change in the percentage of female athletes over the years. The highest percentage of female athletes was in 2003, at 48.62 percent. Thereafter, the percentage has hovered in the 40 to 44 percent range, while the percentage of female undergraduates has ranged from approximately 56 to 60 percent. The disparity between the percentage of female undergraduates and the percentage of female athletes has fluctuated between 12 and 20 percent, showing no significant improvement between 2009 to 2016.

Plaintiffs have provided data regarding the number of women participating in each EMU sport between 2003 and 2016. (Doc. 17-3). This information includes participation figures for women's basketball, track (combined), golf, gymnastics, rowing, soccer, softball, swimming and

diving, tennis, and volleyball.  Because the filed exhibit is not legible,

Plaintiffs provided the court with an electronic copy of the spreadsheet.

The data are reproduced in the chart below:

| EADA Survey Year | Basket-ball | Track | Golf | Gymnas-tics | Rowing | Soccer | Softball | Swim and Dive | Tennis | Volley-ball |
|---|---|---|---|---|---|---|---|---|---|---|
| 2003 | 14 | 37 | 10 | 19 | 72 | 26 | 16 | 31 | 7 | 14 |
| 2004 | 15 | 94 | 10 | 21 | 51 | 25 | 25 | 30 | 10 | 17 |
| 2005 | 15 | 70 | 9 | 17 | 30 | 25 | 34 | 25 | 7 | 15 |
| 2006 | 14 | 68 | 9 | 19 | 51 | 24 | 17 | 25 | 9 | 14 |
| 2007 | 15 | 22 | 9 | 20 | 37 | 29 | 16 | 27 | 8 | 13 |
| 2008 | 18 | 28 | 7 | 20 | 35 | 22 | 15 | 31 | 7 | 12 |
| 2009 | 23 | 39 | 10 | 20 | 37 | 20 | 19 | 31 | 8 | 15 |
| 2010 | 14 | 39 | 10 | 22 | 53 | 24 | 23 | 32 | 8 | 15 |
| 2011 | 15 | 81 | 9 | 23 | 33 | 22 | 23 | 31 | 9 | 14 |
| 2012 | 24 | 96 | 9 | 23 | 54 | 24 | 21 | 37 | 10 | 18 |
| 2013 | 15 | 88 | 9 | 23 | 76 | 26 | 17 | 35 | 8 | 16 |
| 2014 | 25 | 97 | 9 | 22 | 50 | 28 | 21 | 35 | 9 | 15 |
| 2015 | 19 | 105 | 9 | 18 | 49 | 28 | 22 | 50 | 8 | 14 |
| 2016 | 16 | 109 | 7 | 18 | 54 | 20 | 23 | 36 | 9 | 13 |

Between 2003 and 2016, basketball, golf, gymnastics, soccer,

softball, tennis, and volleyball experienced minor fluctuations in the overall

number of participants. The swimming and diving team was often relatively

consistent in size until an increase in 2015 that did not last into 2016. The

rowing and track teams have seen significant fluctuations in size; both

increases and decreases, although track has been generally on an upward

trend since 2010.  The figures Defendants submitted regarding the number

of athletes in the 2017-2018 school year suggests that the size of these

teams has remained consistent between 2016 and 2018. (Doc. 34-3 at PageID 1159).

The participation numbers do not provide clear support for EMU's contention that it has a history of expanding athletic opportunities for women.  Part two of the test is not just concerned with an increase in the number of women's opportunities, however. The test also directs the court to consider whether the expansion in women's opportunities is "*demonstrably responsive to the developing interests and abilities of the underrepresented sex."* 1996 Clarification at 3 (emphasis added).

Defendants do not articulate how they have attempted to respond to the developing interests and abilities of female EMU students.  EMU has not, for example, explained how its goal to increase track rosters is responsive to the developing interests and abilities of women.  Nor has EMU articulated what those developing interests and abilities might be. EMU has not conducted interest surveys to gauge student interest in athletics for the past few years. (Doc. 34-2 at PageID 1141).

The court also considers EMU's history of adding or upgrading women's teams.  EMU has no recent record of adding women's teams and has not provided evidence regarding whether students have requested such opportunities.  Women's field hockey and men's gymnastics were

eliminated in 1988.  Women's rowing was added and men's tennis and soccer were eliminated in 2000.  Since 2000, the number of women's teams remained constant until the elimination of softball and tennis in 2018. (Doc. 13-2 PageID 166.)

The court next considers whether EMU has established a continuing practice of program expansion.  The administering agency advises the court to consider two factors: (1) EMU's current implementation and effective communication of a nondiscriminatory policy for requesting new sports, and (2) EMU's current implementation of a plan of program expansion that is responsive to developing interests and abilities.

Defendants make no showing regarding a policy for requesting new sports at EMU. Relatedly, Defendants do not establish that such a policy is effectively communicated to students.

To show a continuing plan of program expansion, Defendants rely on "a new, expanded" roster management plan ("2018 Plan").  The 2018 Plan comprises four charts showing that EMU intends to add 56 women student athletes to its existing teams (including 30 to the existing 65 on the crew team) by fiscal year 2023.  EMU is also considering creating a women's lacrosse team in fiscal year 2021, which could provide 35 additional opportunities for women student-athletes.  EMU contends that it expects

306 male and 306 female athletes for 2018-19, which would raise its participation rate for female athletes to 50 percent. EMU has not provided actual numbers to the court for the upcoming season, however. EMU also has not explained how this roster management plan is responsive to the developing interests and abilities of student-athletes.

Other than the estimates projected in the roster management plans, Defendants have not provided further information supporting their plan for program expansion such that the court may assess Defendants' past success in meeting their targets, whether the targets are realistic, and whether adding athletes to existing teams is responsive to the interests and abilities of female athletes. Without additional information, the court is unable to assess whether EMU's estimates reflect a meaningful expansion of the program, particularly when EMU's actual numbers do not reflect a history of expansion. Nor is the court able to assess whether EMU's proposal to add an additional sport (lacrosse) or more athletes (rowers) is responsive to the developing interests and abilities of current or future athletes.

Based upon this record, the court is unable to conclude that Defendants have met their burden of demonstrating a history and continuing practice of expansion. The actual numbers reveal a

participation disparity that has lingered for at least fifteen years, with no evidence of a serious effort to address it.  In light of this history, it is difficult for the court to credit EMU's 2018 roster management plan as anything more than "mere promises to expand its program . . . at some time in the future," which is insufficient to satisfy part two of the Three-Part Test. *See* 1996 Clarification at 4.

Defendants argue that the elimination of women's tennis, softball, men's wrestling, and men's swimming and diving will serve to increase the female participation rate to 50 percent, thus demonstrating a move toward proportionality and Title IX compliance.  However,

> OCR will not find a history and continuing practice of program expansion where an institution increases the proportional participation opportunities for the underrepresented sex by reducing opportunities for the overrepresented sex alone or by reducing participation opportunities for the overrepresented sex to a proportionately greater degree than for the underrepresented sex.  This is because part two considers an *institution's good faith remedial efforts through actual program expansion.*

1996 Clarification at 3-4 (emphasis added).  *See Roberts*, 998 F.2d at 830 ("[T]he ordinary meaning of the word 'expansion' may not be twisted to find compliance under this prong when schools have increased the relative percentages of women participating in athletics by making cuts in both men's and women's sports programs."); *Cohen II*, 991 F.2d at 906 ("[E]ven

balanced use of the budget-paring knife runs afoul of Title IX where, as here, the fruits of a university's athletic program remain ill-distributed after the trimming takes place.").  Moreover, EMU's action in eliminating teams was not taken with the intent of moving the university into full compliance with the Title IX proportionality test (part one), but admittedly for financial reasons. *Cf. Equity in Athletics I*, 504 F. Supp.2d at 91 (upholding reduction in men's and women's teams taken to bring university into compliance with Title IX proportionality test).  Given the limited information provided by EMU, the court is unable to conclude that the university has engaged in good faith remedial efforts through actual program expansion.  EMU has not met its burden of demonstrating that it satisfies part two of the Three-Part Test.

### 3. Part Three – Interests and Abilities Fully Accommodated

Under part three, the court considers whether women's "interests and abilities have been fully and effectively accommodated by the present program."  Defendants do not argue that EMU satisfies this part of the test.  Indeed, Plaintiffs, as members of eliminated teams, represent interests and abilities that are not effectively accommodated by the present program. Accordingly, part three of the Three-Part Test does not provide safe harbor for Defendants.

### 4. Conclusion

Plaintiffs have met their burden and established that EMU does not provide substantially proportionate participation opportunities and that there is unmet interest in athletic opportunities. Defendants have failed to meet their burden to establish compliance with either the second or third prong of the Three-Part Test. Plaintiffs are therefore likely to succeed on the merits of their Title IX claim.

### E. Irreparable Harm

Plaintiffs' claim of irreparable harm is based on the inability to participate in their sports and the alleged barriers to transferring to other schools. Plaintiffs also argue that irreparable harm is often presumed in cases involving the enforcement of civil rights.

Defendants argue that there is no irreparable harm because the student-athletes may keep their scholarships and have not shown that they are unable to transfer. They state that Mayerova would be able to alter her visa without leaving the United States and Chretien could attend another institution, like Western Michigan University, that offers an aviation program and a softball team. Defendants also assert that Plaintiffs' delay in filing this action undermines a finding of irreparable harm.

In general, courts have found that the elimination of a women's team creates irreparable harm when the plaintiffs have demonstrated a strong likelihood of success on the merits of their Title IX claim. *See Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277 (D. Conn. 2009); *Cohen v. Brown Univ.*, 809 F. Supp. 978 (D. R.I. 1992), *aff'd* 991 F.2d 888 (1st Cir. 1993); *Favia v. Indiana Univ. of Penn.*, 812 F. Supp. 578 (1993); *Choike v. Slippery Rock Univ.*, 2006 WL 2060576 (W.D. Pa. July 21, 2006); *Barrett v. West Chester Univ. of Penn.*, 2003 WL 22803477 (E.D. Pa. Nov. 12, 2003).

In *Favia*, the court found that by cutting the women's field hockey and gymnastics teams,

> [the university] has denied plaintiffs the benefits to women athletes who compete interscholastically: they develop skill, self-confidence, learn team cohesion and a sense of accomplishment, increase their physical and mental well-being, and develop a lifelong healthy attitude. The opportunity to compete in undergraduate interscholastic athletics vanishes quickly, but the benefits do not. We believe the harm emanating from lost opportunities for the plaintiffs are likely to be irreparable.

*Favia*, 812 F. Supp. at 583. *See also Biediger*, 616 F. Supp. 2d at 291 ("Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis."); *Barrett,* 2003 WL 22803477 at *14 ("Plaintiffs have a finite period

of time in which to compete."); *Choike*, 2006 WL 2060576 at *9. Aside from recognizing the lost opportunity to participate in intercollegiate athletics, courts have found that delaying the reinstatement of a team until the conclusion of litigation creates additional harms such as the loss of training time and competitive edge and the inability to attract quality players and coaches. *Cohen I*, 809 F. Supp. at 997-98; *Barrett,* 2003 WL 22803477 at *13-14.

Defendants point to cases in which courts have found irreparable harm to be lacking. *See Equity in Athletics v. U.S. Dept. of Educ.*, 291 Fed. Appx. 517 (4th Cir. 2008) (*Equity in Athletics II*); *Miller v. Univ. of Cincinnati*, 2007 WL 2783674 (S.D. Ohio Sept 21, 2007); *Gonyo v. Drake Univ.*, 837 F. Supp. 989 (S.D. Iowa 1993). In each of these cases, however, the court found that the plaintiffs were unlikely to succeed on the merits of their Title IX claim. The calculus is different when, as in this case, the plaintiffs have demonstrated that their right to be free from discrimination under Title IX has likely been violated. Indeed, there is "a presumption of an irreparable injury when a plaintiff has shown a 'violat[ion] [of] a civil rights statute.'" *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) (Fair Housing Act); *Board of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208

F. Supp. 3d 850, 878 (S.D. Ohio 2016) ("Jane can show irreparable injury simply because both her Title IX claim and constitutional claim are likely to succeed on the merits.").

In addition, the court agrees with the *Biediger* court that cases like *Equity in Athletics II* and *Miller* "give insufficient consideration to the unique circumstances college athletes face, making short shrift of the brief time-span in which they are permitted to compete and failing to consider the loss that even a year of competition would have on the skills and competitiveness of elite Division I athletes such as the student plaintiffs in this case." *Biediger*, 616 F. Supp. 2d at 292.

For these reasons, the court determines that Plaintiffs have established irreparable harm. This conclusion is not altered by Defendants' argument regarding delay. EMU announced the decision to cut the softball and tennis teams on March 20, 2018. After attempting to resolve the matter short of litigation and having difficulty finding counsel willing to sue the university, Plaintiffs filed their complaint and motion for preliminary injunction on June 15, 2018. Under the circumstances, the court does not find this relatively short delay to be unreasonable or to undercut Plaintiffs' showing of irreparable harm.

## F. Balance of Harms

Defendants assert that reinstating the softball and tennis teams would cost approximately $1 million, forcing EMU to divert resources from other programs and harming other EMU students. The court recognizes this financial burden, as the cost to reinstate the teams is not insignificant. The court notes, however, that Defendants have not provided information regarding EMU's entire athletic budget, precluding a complete assessment of whether the reinstatement of the teams would present an undue burden on EMU. *See Barrett*, 2003 WL 22803477 at *14 ("In examining this fact, courts generally look to the school's athletic budget and consider the overall expense of reinstating the program[s] as compared with the entire athletic budget."); *Favia*, 812 F. Supp. at 854 (no undue harm to defendants where the "budget, while shrinking, has space for reallocation and cutbacks in other areas").

Moreover, the court finds that the financial burden on EMU is outweighed by the harm to Plaintiffs if the teams are not reinstated. Indeed, financial hardship is not a defense to a Title IX violation. *See Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 275 (6th Cir. 1994) (an institution "may not simply plead limited resources to excuse the fact that there are fewer opportunities for girls than for boys"). Although it is

mindful of and sympathetic to EMU's need to cut costs, the court concludes that the balance of equities favors Plaintiffs.

### G. Public Interest

Defendants assert that the public interest strongly favors deferring to EMU's budgetary decision. Defendants rely upon *Equity in Athletics I,* which determined that the public interest "weighs in favor of permitting colleges and universities to chart their own course in providing athletic opportunities without judicial interference or oversight, *absent a clear showing that they are in violation of the law*." 504 F. Supp. 2d at 112 (quoting *Gonyo*, 837 F. Supp. at 996) (emphasis added). The court acknowledges that the public interest is generally served by allowing public universities to determine how to allocate financial resources, but, as stated above, there is a clear showing that Defendants are in violation of Title IX. Moreover, "the public interest demands that [EMU] comply with federal law and in this instance that means compliance with Title IX." *Barrett*, 2003 WL 22803477 at *15. *See also Cohen I,* 809 F. Supp. at 1001 (stating that "the public interest will be served by vindicating a legal interest that Congress has determined to be an important one"); *Favia,* 812 F. Supp. at 585 ("The public has a strong interest in prevention of any violation of constitutional rights."). "Title IX does not purport to override financial necessity. Yet, the

pruning of athletic budgets cannot take place solely in comptrollers' offices, isolated from the legislative and regulatory imperatives that Title IX imposes." *Cohen II*, 991 F.2d at 905. For these reasons, the court finds that the public interest is best served by upholding the goals of Title IX.

### H.  Modification of the Status Quo

Defendants argue that a preliminary injunction is disfavored here because the softball and tennis teams have already been eliminated and plaintiffs seek to modify the status quo rather than preserve it. *See generally Cox v. Jackson*, 579 F. Supp.2d 831, 855 (E.D. Mich. 2008) (noting motions seeking to modify rather than maintain the status quo should be "more closely scrutinized").  The court has indeed closely scrutinized Plaintiffs' request and has recognized the burden on EMU's budget and autonomy, but has nonetheless determined that a careful balancing of the preliminary injunction factors favors granting Plaintiffs' requested relief.  *See Cohen I*, 809 F. Supp. at 1000 ("[E]ven if the current configuration of teams were considered the status quo, restoring women's gymnastics and volleyball to full varsity status through a preliminary injunction is the only effective tool available to this Court to prevent irreparable harm.").  Further, the court is confident that practical impediments to reinstatement can be overcome.  Plaintiffs "merely seek

what the law requires, equal athletic opportunities. . . . [Reinstatement] is the least the Athletic Department can do in light of its legal violations." *Favia*, 812 F. Supp. at 585.

<u>**CONCLUSION**</u>

Therefore, IT IS HEREBY ORDERED that Plaintiffs' motion for preliminary injunction (Doc. 3) is GRANTED.  The court recognizes that its ability to craft a solution is limited and that often the parties are in a better position to accommodate the interests of both sides.  Accordingly, the parties shall attend a status conference with the court on October 23, 2018, at 2:00 p.m. to discuss the implementation of the court's order.

IT IS SO ORDERED.

Dated:  September 27, 2018

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 27, 2018, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk